567 S.E.2d 265

STATE of West Virginia ex rel. James DUNLAP, Petitioner,

v.

Honorable Irene C. BERGER, Judge of the Circuit Court of Kanawha County, and Friedman's, Inc., dba Friedman's Jewelers, et al., Respondents.

No. 30035.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 8, 2002.

Decided June 13, 2002.

David L. Grubb, Esq., John W. Barrett, Esq., Grubb Law Group, Brian A. Glasser, Esq., Bailey & Glasser, Charleston, West Virginia, Attorneys for Petitioner.

Gregory R. Hanthorn, Esq., Jones, Day, Reavis & Pogue, Atlanta, GA, Pro Hac Vice for Respondent, Friedman's, Inc.

P. Michael Pleska, Esq., Fazal A. Share, Esq., Ronda L. Harvey, Esq., Bowles, Rice, McDavid, Graff & Love, Charleston, West Virginia, Attorneys for Respondent, Friedman's, Inc.

Harry Deitzler, Esq., Hill, Peterson, Carper, Bee & Deitzler, Charleston, Michael J. Quirk, Esq., Khalid Elhassan, Esq., Trial Lawyers for Public Justice, Washington, DC, for Amicus Curiae, Trial Lawyers for Public Justice.

Charles L. Woody, Esq., Spilman, Thomas & Battle, Charleston, for American Banks Ins. Co. and American Bankers Life Assurance Co.

Farrokh Jhabvala, Esq., Jorden, Burt LLP, Miami, FL, Pro Hac Vice for Respondent, American Banks Ins. Co. and American Bankers Life Assurance Co.

STARCHER, Justice:

In the instant case, Mr. James Dunlap,[1] who is a plaintiff below and the petitioner before this Court, claims in a civil lawsuit filed in May of 2000 in the Circuit Court of Kanawha County that Friedman's, Inc., a jewelry store chain doing business in West Virginia ("Friedman's"); Friedman's insurance company partners, American Bankers Insurance Company of Florida and American Bankers Life Assurance Company of Florida (together, American Bankers"); and certain named individuals who are or were managerial employees of Friedman's—all of whom are the defendants below and the respondents in the instant case before this Court (we shall refer to these respondents together as "Friedman's et al.")—have been carrying out a systematic, deceptive, and illegal "loan packing" scheme, with the purpose and effect of surreptitiously adding unrequested insurance charges to the cost of consumers' purchases from Friedman's. In Mr. Dunlap's case, allegedly illegal charges in the amounts of $1.48 for credit life insurance and $6.96 for property insurance were added when Mr. Dunlap bought a ring from Friedman's in 1999; we discuss the details of that purchase *infra.*

The circuit court concluded that Mr. Dunlap could not go forward with his lawsuit against Friedman's et al. in the circuit court because of certain language in Friedman's purchase and financing agreement document, a form contract that Mr. Dunlap signed when he bought the ring. The circuit court stayed the prosecution of Mr. Dunlap's civil lawsuit against Friedman's et al., and directed Mr. Dunlap (over his objection) to proceed to arbitration proceedings with Friedman's et al., pursuant to language in the purchase and

---

1. Ms. Stephanie Gibson is Mr. Dunlap's co-plaintiff in the case below; her claim is essentially the same as Mr. Dunlap's. However, her purchase and financing agreement document did not contain the language that is at issue in the instant case. The fact that two plaintiffs have joined their claims in one case does not affect our consideration of Mr. Dunlap's petition.

financing agreement document. Challenging the circuit court's order, Mr. Dunlap has petitioned this Court for a writ of prohibition; we conclude that the circuit court's order was erroneous.

I.

*Facts & Background*

Mr. Dunlap filed suit against Friedman's *et al.* on May 4, 2000. His complaint (we refer here to an amended complaint that the circuit court permitted to be filed) charges that Friedman's *et al.* have been engaged in an illegal, fraudulent, and unconscionable scheme to charge customers, without the customers' request, knowledge, and/or consent, for credit life insurance, credit disability insurance, and property insurance—all in connection with the purchase and financing of jewelry and/or other consumer goods from Friedman's.

Mr. Dunlap specifically alleges that Friedman's systematically and deliberately directed its employees to conceal and lie about these added charges—going so far as to discharge or threaten to discharge employees who would not go along with the added charges/concealment scheme. Mr. Dunlap has supported his allegations of a comprehensive scheme to defraud consumers with affidavits (filed with his complaint) from former Friedman's employees and customers.

In one of these affidavits, a former Friedman's manager attested:

I was advised by [a Friedman's trainer] to sell property, life and disability insurance to customers who financed their purchases. I was specifically told to just add the insurance onto the sale.... I felt very uncomfortable following these orders. I believed that Friedman's practice of charging consumers a premium for insurance without disclosing it to the consumers was fraudulent, deceitful and wrong.... On many occasions, my employees, per Friedman's orders, sold disability, life and property insurance to customers who financed jewelry, and did not disclose to the customer that the insurance was added to the sale.

Another former Friedman's manager attested:

The computers at our stores were programmed to automatically add on charges for credit life, credit disability and property insurance onto the customer's retail installment contract. In order to remove these charges, the employee would have to manually delete them. I felt very uncomfortable following these orders. I believed that Friedman's practice of charging consumers a premium for insurance without disclosing it to the consumers was fraudulent, deceitful and wrong.

Another former Friedman's employee attested:

... I was informed by ... the district manager, that we, as employees of Friedman's Jewelers, Inc. were to add life, disability and property insurance to customer credit applications without disclosing this information to the customer. If we did not do what was requested, we would be fired. He informed me that two people had been dismissed in Roanoke for refusing to do what they asked.... I was again informed by ... the store manager, during a staff meeting that we were to add life, disability and property insurance to customer credit applications without disclosing this information to the customer.... When I questioned what should we do if a customer questions the insurance, I was told that we should tell the customer that it was a computer error.

One Friedman's employee quit working for Friedman's "after she was instructed to deceive customers," according to an administrative law judge who ruled that the employee was entitled to receive unemployment compensation benefits. The judge's decision further stated:

In this case, the employer instructed its employees to use deceptive practices with regards to the sale of property, disability and life insurance to customers. When a customer opened an account to charge jewelry at the store, the employees were told to automatically add a premium based upon the amount of the charge for life, disability and property insurance. They were told not to give the customer a

choice, that they were to automatically add it to the cost of the merchandise. They were further advised that if they did not add the insurance, that they would lose their jobs.

Another former Friedman's employee attested:

Around May 1999, I was informed by ... the district manager, that we, as employees of Friedman's Jewelers, Inc. were to add life, disability and property insurance to customer credit applications without disclosing this information to the customer. If we did not do what was requested, we would be fired.

In his circuit court lawsuit, Mr. Dunlap seeks to enforce and vindicate his and other consumers' right not to be victimized by such illegal schemes. Specifically, Mr. Dunlap seeks the following relief and remedies from the circuit court: (1) a declaratory judgment declaring that Friedman's, et al.'s conduct violated the West Virginia Consumer Credit & Protection Act, W.Va.Code, 46A–1–101 et seq. ("the Consumer Protection Act"), West Virginia insurance laws, and the Uniform Commercial Code; (2) an injunction ordering Friedman's et al. to cease their illegal conduct, to establish an employee training program on consumer protection in West Virginia, and to revise its sales procedures for insurance; (3) certification of a class of persons whose rights have been violated by Friedman's et al. in the fashion that Mr. Dunlap's were; (4) court-ordered cancellation of the plaintiffs' and class members' indebtedness to Friedman's et al.; (5) judgment to each plaintiff and class member for statutory damages under the Consumer Protection Act for each violation of the Act; (6) judgment for actual, consequential and incidental damages suffered by each plaintiff and member of the class, including damages for emotional distress, annoyance and inconvenience; (6) judgment for punitive damages to each plaintiff and class member; (7) an award of attorneys' fees; (8) pre-and post-judgment interest; and (9) such other relief as the court determines. Mr. Dunlap's causes of action allege violations of the Consumer Protection Act and W.Va.Code, 33–12–1(a) [1957] (selling insurance without a license); common law fraud; unconscionability; breach of duty of good faith under W.Va.Code, 46–1–203 [1963](UCC); negligent and wilful, wanton and intentional misconduct; and civil conspiracy. Mr. Dunlap requested a jury trial.

On June 23, 2000, Friedman's et al. moved the Circuit Court of Kanawha County to prohibit Mr. Dunlap from going forward in circuit court with his claims against Friedman's et al. and to require Mr. Dunlap to bring any disputes that he has with Friedman's et al. to arbitration. The basis of this motion was language contained in the two-page purchase and financing agreement document that Mr. Dunlap signed in connection with his purchase from Friedman's. We shall review this specific language, after generally describing Friedman's purchase and financing agreement document.

The front page of the purchase and financing agreement document is a pre-printed form, containing a number of boxed spaces with printed titles and explanatory language. For each sale or other similar transaction, transaction-specific words and numbers are supposed to be printed in the form's blank spaces (presumably by a computer-driven printer attached to a cash register and ordinarily at the time of the transaction), showing the date of the transaction, the item(s) purchased or returned, any applicable credits or adjustments, and the financing terms, insurance charges, purchase price, interest rate, credits, payment schedule, and other pertinent information about the transaction.

In Mr. Dunlap's case, it appears [2] from the transaction-specific information printed on

---

**2.** In the copy of the Friedman's purchase and financing agreement document memorializing Mr. Dunlap's ring purchase that was submitted with the petition in the instant case, the transaction-specific words and numbers are misaligned with the blank spaces on the form where the words and numbers should appear, making the financial and other details of the transaction difficult to comprehend from the face of the document. Put another way, the transaction-specific information on the form (at least on the copy submitted to this Court) is not readily comprehensible to an average person who is not already familiar with the details of the transaction. Moreover, the pre-printed parts of the document would probably be seen by the average

the front of the Friedman's form that Mr. Dunlap signed, that on or about September 20, 1999, Mr. Dunlap purchased a ring for about $150.00, and that Friedman's "added" to the ring purchase price a $1.48 charge for credit life insurance and $6.96 for property insurance. Mr. Dunlap's signature appears on a pre-printed line on the front of the form, stating that he is "applying" for insurance, and also on a line where he generally agrees to all terms and conditions on both sides of the document. At the bottom of the front of the form is a pre-printed notice that paragraph 14 of the other side of the form includes an alternate dispute resolution procedure, including a requirement for arbitration or mediation. A printed statement says not to sign the form without reading it, or if it contains any blank spaces.

Mr. Dunlap specifically alleges in his complaint that he did not ask for the insurance for which he was charged, that it was not explained to him that there were insurance charges; that the sales clerk simply showed him where to sign his name on the front of the form; and that the form was then placed in a Friedman's envelope, where the information that was actually important to Mr. Dunlap—his monthly payment amount and the number of payments—was written in a space provided on the outside of the envelope. Additionally, Mr. Dunlap states in an affidavit that none of the language in the actual purchase and financing agreement document was explained to him, including the language that purports to limit his remedies against Friedman's. Mr. Dunlap's allegations in his complaint regarding how insurance charges were automatically printed on the Friedman's form and added to his purchase price without his request are consistent with the previously discussed affidavits regarding the mechanism of Friedman's alleged "loan packing" scheme.

The reverse side of the purchase and financing agreement document form is titled "Additional Terms of Purchase," and contains 14 pre-printed numbered paragraphs, followed by additional unnumbered language.

Most of the numbered paragraphs in the document contain standard "boilerplate" language relating to financing, security in the goods purchased, etc., that is not germane to the issues in the instant case. The following language in the document, however, is germane.

Paragraph 3 of the document, titled "DEFAULT," states in pertinent part that if the "Buyer" (Mr. Dunlap) dies, becomes insolvent or goes into bankruptcy, or does not make a timely payment, the "Seller" (Friedman's) may "at its option and without notice, declare the entire unpaid balance immediately due and payable" and "to the extent permitted by Applicable Law" repossess the merchandise that Mr. Dunlap purchased. Additionally, Paragraph 3 says that Mr. Dunlap agrees to pay "all costs incurred in collecting the indebtedness under this Agreement, including, without limitation, reasonable attorney's fees and court costs in an amount not to exceed 15% of the unpaid debt."

Paragraph 14, titled "ALTERNATE DISPUTE RESOLUTION," states in pertinent part:

> All disputes, controversies or claims of any kind or nature between Buyer and Seller, arising out of or in connection with the sale of goods financed or refinanced pursuant to the terms of this Agreement ... or with respect to negotiation of, inducement to enter into, construction of, performance of, enforcement of, or breach of, effort to collect the debt evidenced by, the applicability of the arbitration clause in, or the validity of this Agreement or any earlier agreement (except as specifically set forth in this paragraph 14 below), shall be resolved by arbitration in the state in which this Agreement is entered into, at a location reasonably near the place where you signed this Agreement, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof.... All arbitra-

person as legal gobbledygook. Our discussion *infra* regarding such contracts of adhesion shows that it makes little difference whether they are in fact comprehensible—because people simply don't read them.

tors' or mediators' fees shall be equally divided between the parties. Exception to arbitration and mediation: The Seller may exercise its right upon default by Buyer as set forth in the paragraph entitled "default" above, without resort to arbitration or mediation. Nothing in this paragraph shall be construed to prevent either party's use of bankruptcy or repossession, replevin, judicial foreclosure, non judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests, for contractual debts now or hereafter and by either party to the other under this Agreement. No arbitrator may make an award of punitive damages.

Mr. Dunlap argued before the circuit court that any and all provisions in the above-quoted language from the purchase and financing agreement document that purport to limit or prohibit his claims for relief and remedies against Friedman's *et al.*, in a fashion different from that which is provided in West Virginia constitutional, statutory, and common law, are illegal and unconscionable. Mr. Dunlap also argued that any prohibitions or limitations in these provisions do not apply to his claims against American Bankers, because American Bankers is not mentioned in the purchase and financing agreement document.

On April 19, 2001, the circuit court entered an order that stayed all court proceedings on Mr. Dunlap's claims in circuit court, and required Mr. Dunlap to pursue arbitration with respect to his claims against all of the respondents, pursuant to language in Paragraph 14 of Friedman's purchase and financing agreement document. Mr. Dunlap thereafter sought a writ from this Court to prohibit the enforcement of the circuit court's order, leading to the instant case.

## II.

### Standard of Review

■ Prohibition will lie to hear claims relating to a court's jurisdiction or to address non-jurisdictional issues where a court's challenged ruling or action is clearly contrary to law and an appeal would not be as adequate as review in prohibition. *See* Syllabus Point 1, *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979); Syllabus Points 1, 2, and 3, *State ex rel. Davidson v. Hoke*, 532 S.E.2d 50, 207 W.Va. 332, (2000) (*per curiam*).

The central issue in the instant case is whether the circuit court should exercise the civil jurisdiction that it would ordinarily have to consider *de novo* the merits of Mr. Dunlap's claims against Friedman's *et al.* and to award all appropriate and legally available relief—or whether the circuit court must forego the exercise of its ordinary civil jurisdiction, and play only the relatively deferential and limited role that courts have when reviewing the results of arbitration, *cf.* Syllabus Points 1 and 2, *Boomer Coal and Coke Co. v. Osenton*, 101 W.Va. 683, 133 S.E. 381 (1926).

■ In *State ex rel. United, Inc. v. Sanders*, 204 W.Va. 23, 25–26, 511 S.E.2d 134, 136–37 (1998), we recently granted a "a writ of prohibition to prevent enforcement of the lower court's directive which required United Asphalt to resolve its claims through arbitration." Our use of the writ of prohibition to review the circuit court's action in the instant case is appropriate; state court rules of appellate jurisdiction and procedure are not preempted by the Federal Arbitration Act, 9 U.S.C. Sec. 2 [1947]; *see, e.g., Simmons Co. v. Deutsche Financial Services Corp.*, 243 Ga.App. 85, 532 S.E.2d 436 (2000); *Bush v. Paragon Property, Inc.*, 165 Or.App. 700, 997 P.2d 882 (2000) (*en banc*).

■ In Syllabus Point 3, *Troy Min. Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986), we stated: "Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court." Additionally, in addressing a motion to compel arbitration in the context of a civil action, it is for the court where the action is pending to decide in the first instance as a matter of law whether a valid and enforceable arbitration agreement exists between the parties. *See* Syllabus Points 1 and 2, *Art's Flower Shop, Inc. v. C & P Telephone Co.*, 186 W.Va. 613, 413 S.E.2d 670

(1991). Thus we review the circuit court's legal determinations *de novo*.

### III.

### *Discussion*

### A.

The central issue in this case is whether Mr. Dunlap is correct in asserting the unconscionability of certain provisions in Friedman's purchase and financing agreement document. In *Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 511 S.E.2d 854 (1998), this Court discussed the concept of unconscionability in a consumer transaction. We stated:

> "Unconscionability" is a general contract law principle, based in equity, which is deeply ingrained in both the statutory and decisional law of West Virginia. Of particular importance to this case are the provisions contained in the West Virginia Consumer Credit and Protection Act, *W. Va. Code* § 46A–1–101 *et seq.* (hereinafter "CCPA"), which were specifically designed to eradicate unconscionability in consumer transactions. *W.Va.Code* § 46A–2–121 (1996) of the CCPA provides, in relevant part:

> > (1) With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:

> > (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or

> > (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable term

> or part as to avoid any unconscionable result.

> \* \* \* \* \* \*

> The legislature in enacting the West Virginia Consumer Credit and Protection Act, *W.Va.Code*, 46A–1–101, et seq., in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act. To further this purpose the legislature, by the express language of *W.Va.Code*, 46A–5–101(1), created a cause of action for consumers and imposed civil liability on creditors who include unconscionable terms that violate *W.Va.Code*, 46A–2–121 in consumer agreements.

> \* \* \* \* \* \*

> The basic test is whether, in the light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract.

> [*See* Uniform Consumer Credit Code, § 5.108 comment 3, 7A U.L.A. 170 (1974).] The drafters explained further that "[t]he particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others." *Id.*

*Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 234–235, 511 S.E.2d 854, 859–860 (1998) (citations and footnotes omitted).

 Guided by the foregoing principles, we shall proceed to examine Mr. Dunlap's claim that the provisions of Friedman's purchase and financing agreement document that the circuit court relied on are unconscionable.[3]

3. Because these provisions involve or relate to arbitration, the Federal Arbitration Act, 9 U.S.C. Sec. 2 [1947] ("FAA") is applicable. The FAA provides that contracts to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Under the FAA, a claim of unconscionability is available to a party contesting the validity and enforceability of a contractual provision that requires submission of disputes to arbitration. *Doctors' Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652,

## B.

First, however, we observe that the purchase and financing agreement document that Mr. Dunlap signed was a "contract of adhesion"—and because this term is sometimes used in an imprecise or confusing fashion, a few words of clarification are in order.

In *American Food Management, Inc. v. Henson*, 105 Ill.App.3d 141, 145, 434 N.E.2d 59, 62–63, 61 Ill.Dec. 122, 126 (1982), the court quoted Professor Corbin regarding contracts of adhesion:

"Adhesion contracts" include all "form contracts" submitted by one party on the basis of this or nothing [* * *] Since the

bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts, a rule automatically invalidating adhesion contracts would be completely unworkable. Instead courts engage in a process of judicial review.... Finding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not.[4]

*Id.*

The author of this opinion recently discussed contracts of adhesion in a separate

1656, 134 L.Ed.2d 902, 908 (1996) ("generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA].").

A pre-dispute agreement to use arbitration as an alternative to litigation in court may be enforced pursuant to the FAA only when arbitration, although a different forum with somewhat different and simplified rules, is nonetheless one in which the arbitral mechanisms for obtaining justice permit a party to fully and effectively vindicate their rights. As the Supreme Court stated in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26, 37 (1991): "[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." (citation omitted); *see Paladino v. Avnet Computer Technologies*, 134 F.3d 1054, 1059 (11th Cir.1998) ("This is so because 'the beneficiaries of public statutes are entitled to the rights and protections provided by the law,' including 'all of the types of relief that would otherwise be available in court.'" (citations omitted); *see also Cole v. Burns Intern. Security Services*, 105 F.3d 1465, 1482 (D.C.Cir. 1997)).

In *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 313 (6th Cir.2000), the court stated:

[E]ven if arbitration is generally a suitable forum for resolving a particular statutory claim, the specific arbitral forum provided under an arbitration agreement must nevertheless allow for the effective vindication of that claim. Otherwise, arbitration of the claim conflicts with the statute's purpose of both providing individual relief and generally deterring unlawful conduct through the enforcement of its provisions.

*See also Paladino, supra*, 134 F.3d at 1062 (Cox, J. concurring, for a majority of the court) (the arbitrability of claims "rests on the assumption that the arbitration clause permits relief equivalent to court remedies.... When an arbitration

clause has provisions that defeat the remedial purpose of the statute ... the arbitration clause is not enforceable.") (citing *Cole, supra* ); *Graham Oil v. ARCO Products Co.*, 43 F.3d 1244, 1247–48 (9th Cir.1994) (invalidating an arbitration agreement that required a claimant to forfeit rights and benefits guaranteed by the Petroleum Marketing Practices Act, including imposing a limit on the recovery of punitive damages and attorneys' fees and a one-year statute of limitations); *Parrett v. City of Connersville, Inc.*, 737 F.2d 690, 697 (7th Cir.1984) (holding that arbitration offended due process where arbitrator could not award full common law damages nor prevent harm to plaintiff before it occurred); *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 256 (S.D.N.Y.1998) ("arbitration must allow remedies central to the statutory scheme ... [and] sufficient to satisfy statutory purposes"); *DeGaetano v. Smith Barney, Inc.*, 983 F.Supp. 459, 469 (S.D.N.Y.1997) (voiding provision of arbitration agreement that disallowed attorneys' fees to prevailing plaintiff in Title VII claim after concluding that "contractual clauses purporting to mandate arbitration of statutory claims ... are enforceable only to the extent that the arbitration preserves the substantive protections and remedies afforded by the statute."); *LaChance v. Northeast Pub., Inc.*, 965 F.Supp. 177, 185 (D.Mass.1997) (allowing plaintiff to pursue judicial claim under the Americans with Disabilities Act where arbitration agreement did not authorize arbitrator to provide remedy of 'reasonable accommodation' which plaintiff was entitled to pursuant under the Act). This reasoning extends not only to protect a party's right to seek and obtain all of the remedies that are afforded by law under specific statutory claims, but also to protect a party's right to fully and effectively vindicate rights that are secured by the common law for the benefit of citizens generally—such as the right to be free of oppression and fraud.

4. Other authorities similarly recognize that in a contract of adhesion, a party's
 "contractual intention is but a subjection more or less voluntary to terms dictated by the

558

concurring opinion in *Mitchell v. Broadnax*, 208 W.Va. 36, 52, 537 S.E.2d 882, 898 (2000) (Starcher, J., concurring):

The drafters of the *Restatement of Contracts Second,* in their discussions regarding contracts of adhesion like an insurance policy, recognized that:

A party who makes regular use of a standardized form of agreement does not ordinarily expect his customers to understand or even to read the standard terms. One of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms. Employees regularly using a form often have only a limited understanding of its terms and limited authority to vary them. Customers do not in fact ordinarily understand or even read the standard terms. They trust to the

stronger party, terms whose consequences are often understood in a vague way, if at all." Such standardized contracts have been described as those in which one predominant party will dictate its law to an undetermined multiple rather than to an individual. They are said to resemble a law rather than a meeting of the minds.

*Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 389, 161 A.2d 69, 86 (1960) (citations omitted). *See also Boase v. Lee Rubber & Tire Corp.,* 437 F.2d 527, 530 (3rd Cir.1970) ("The originator of the term 'adhesion contract' ... defined such agreements as those in which one predominant unilateral will dictate its law to an undetermined multitude rather than to an individual * * * as in all employment contracts of big industry * * * and all those contracts which, as the Romans said, resemble a law much more than a meeting of the minds [citations omitted].")

In *Neal v. State Farm Ins. Companies,* 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781, 784 (1961), the court stated:

Commentators have characterized the type of agreement before us as a "contract of adhesion." ... Such an agreement does not issue from that freedom in bargaining and equality of bargaining which are the theoretical parents of the American law of contracts. Yet, today, the impact of these standardized contracts can hardly be exaggerated. "Most contracts which govern our daily lives are of a standardised [sic] character. We travel under standard terms, by rail, ship, aeroplane, or tramway. We make contracts for life or accident assurances under standardised [sic] conditions. We rent houses or rooms under similarly con-

good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. *But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose* [citation omitted, emphasis in original].

In a number of cases, this Court has considered exculpatory provisions in such contracts of adhesion that would if applied effectively limit a party's legal exposure, accountability, or liability in a fashion that would otherwise not exist under general law. A review of these cases shows that such exculpatory provisions in contracts of adhesion are given close scrutiny, with respect to both their construction and their potential for unconscionability, particularly where rights, remedies and protections that exist for the public benefit are involved.

trolled terms; authors or broadcasters, whether dealing with public or private institutions, sign standard agreements; government departments regulate the conditions of purchases by standard conditions." [citations omitted].

In *Broemmer v. Abortion Services of Phoenix, Ltd.,* 173 Ariz. 148, 151, 840 P.2d 1013, 1016 (1992), the court stated:.

The conclusion that [a] contract was one of adhesion is not, of itself, determinative of its enforceability. "[A] contract of adhesion is fully enforceable according to its terms [citations omitted] unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." *Graham v. Scissor–Tail, Inc.,* 28 Cal.3d 807, 820 171 Cal.Rptr. 604, 611, 623 P.2d 165, 172 (1981) (footnotes omitted). To determine whether this contract of adhesion is enforceable, we look to two factors: the reasonable expectations of the adhering party and whether the contract is unconscionable. As the court stated in *Graham:*

Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him. [citations omitted] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable."

For example, we held in *Murphy v. North American River Runners,* 186 W.Va. 310, 316, 412 S.E.2d 504, 510 (1991), reviewing a form waiver of liability, that "a general clause in an exculpatory agreement or anticipatory release exempting the defendant from all liability for any future negligence will not be construed to include intentional or reckless misconduct or gross negligence, unless such intention clearly appears from the circumstances." Similarly, in Syllabus Point 3 of *Auber v. Jellen,* 196 W.Va. 168, 469 S.E.2d 104 (1996) (*per curiam* ), we held that "[a]mbiguous provisions in an insurance policy, especially a policy having the qualities of a contract of adhesion, are to be construed against the insurer and in favor of the insured."

In *Hill v. Joseph T. Ryerson & Son, Inc.,* 165 W.Va. 22, 38–39, 268 S.E.2d 296, 307 (1980), upholding a lower court's refusal to enforce an exculpatory provision in a form purchase agreement document, we noted that ... [the sale] was handled in a routine fashion. There is nothing in the record to suggest that there was any advance bargaining between Ryerson and U.S. Steel as to the terms of the sale and, in particular, as to the exculpatory language. The record does not demonstrate that any price concessions were given in return for the exculpatory provision. It does not appear that any formal contract was signed by the parties in advance of the sale, but rather that the pipe order was placed by Ryerson with U.S. Steel by a written purchase order on a printed form prepared by Ryerson. U.S. Steel subsequently acknowledged the purchase order by its order acknowledgement form which contained certain conditions, including the exculpatory clause, on its reverse side. The initial purchase order of Ryerson contained conditions which were inconsistent with the exculpatory language contained on the U.S. Steel acknowledgement of order form. This fact, when coupled with the absence of any evidence to demonstrate that there had been any bona fide bargaining over the terms and conditions of the sale, compels us to conclude that the exculpatory language asserted by U.S. Steel was not an essential part of the sale. The trial court

was thus correct in denying to U.S. Steel the benefit of the exculpatory clause.

This Court's close scrutiny of exculpatory provisions in contracts of adhesion—particularly those that would unconscionably impair rights that are afforded under the law designed to protect the public—is reinforced by the public policy of this State, as enacted by the Legislature. For example, in Syllabus Point 2 of *U.S. Life Credit Corp. v. Wilson,* 171 W.Va. 538, 301 S.E.2d 169 (1982), we recognized that the "legislature in enacting the West Virginia Consumers Credit and Protection Act, W.Va.Code, 46A–1–101, *et seq.,* in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act." *See also W.Va.Code,* 46A–6–107 [1974], which prohibits and voids the attempted waiver in consumer transactions of warranties, and any remedies for the breach of warranties. Such consumer agreements and transactions, of course, ordinarily involve contracts of adhesion.

Another example of our law's disfavoring of exculpatory provisions in adhesion contracts that derogate public rights may be found in *Teller v. McCoy,* 162 W.Va. 367, 253 S.E.2d 114 (1978), where this Court held that in residential housing leases, the waiver of the implied warranty of habitability is prohibited as against public policy.

In *Bd. of Ed. v. W. Harley Miller,* 160 W.Va. 473, 486, 236 S.E.2d 439, 447 (1977), former Justice Richard Neely pointed out the strong potential for unconscionability that exists in connection with exculpatory provisions in contracts of adhesion. He stated:

In real life we can envisage ... provisions being imposed upon consumers in contract situations where consumers are totally ignorant of the implications of what they are signing, and where consumers bargain away many of the protections which have been secured for them with such difficulty at common law.

Based on all of the foregoing and in fidelity to the approach that we have long taken in this area, we recognize and hold that exculpatory provisions in a contract of adhesion that if applied would prohibit or sub-

stantially limit a person from enforcing and vindicating rights and protections or from seeking and obtaining statutory or common-law relief and remedies that are afforded by or arise under state law that exists for the benefit and protection of the public are unconscionable; unless the court determines that exceptional circumstances exist that make the provisions conscionable.[5]

## C.

Mr. Dunlap argues that several prohibitions on and/or limitations of his rights and remedies—that are part of Paragraph 14 in Friedman's purchase and financing agreement document—are unconscionable exculpatory provisions in a contract of adhesion.[6]

Mr. Dunlap identifies, as a threshold prohibition or limitation, the deprivation of his constitutional right to have a jury trial in the West Virginia circuit court system on his claims against Friedman's *et al.*

Mr. Dunlap has a fundamental constitutional right to use West Virginia's court system to seek justice. The *West Virginia Constitution*, Article III, § 17 states:

> The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

And the *West Virginia Constitution*, Article III, § 13 states:

> In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved; and in such suit in a court of limited jurisdiction a jury shall consist of six persons. No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.

These constitutional rights—of open access to the courts to seek justice, and to trial by jury—are fundamental in the State of West Virginia. Our constitutional founders wanted the determinations of what is legally correct and just in our society, and the enforcement of our criminal and civil laws—to occur in a system of open, accountable, affordable, publicly supported, and impartial tribunals—tribunals that involve, in the case of the jury, members of the general citizenry. These fundamental rights do not exist just for the benefit of individuals who have disputes, but *for the benefit of all of us.* The constitutional rights to open courts and jury trial serve to sustain the existence of a core social institution and mechanism upon which, it may be said without undue grandiosity, our way of life itself depends.

We have recognized, of course, that the constitutionally-enshrined and fundamental rights to assert one's claims for justice before a jury in the public court system may be the subject of a legally enforceable waiver. *See, e.g., Stephenson v. Ashburn,* 137 W.Va. 141, 70 S.E.2d 585 (1952). In *Moon v. Michael Koslow Const., Inc.,* 193 W.Va. 673, 676, 458 S.E.2d 610, 613 (1995), we said:

> Koslow did not waive its right to a trial by jury. In its answer to the Moons' complaint, a jury trial was demanded. Furthermore, at the pretrial conference, Koslow made a timely objection to the circuit court's decision to refer the case to a special commissioner. Rule 38(a) of the Rules of Civil Procedure provides that "[t]he

---

**5.** Because unconscionability is an equitable matter and must in the final analysis be determined on a case-by-case basis, a rule that admits of no exceptions is not appropriate. However, a rebuttable presumption is consistent with public policy and retains the flexibility that a court of equity requires.

**6.** Mr. Dunlap also asserts that the limitations on his rights and remedies that were included in Friedman's purchase and financing agreement document are unenforceable because Mr. Dunlap was not actually aware of and did not consciously agree to the limiting provisions. Friedman's *et al.* reply that the language relating to these limitations was "prominently displayed" on the document form, and was accompanied by a written warning to "be sure to read all of this document." As our discussion of contracts of adhesion *supra* shows, Friedman's *et al.*'s reliance on a "written warning" misses the point. The legal enforceability *vel non* of exculpatory provisions in contracts of adhesion has little to do with whether there are self-serving caveats in a document that is not going to be read, and everything to do with whether the provisions would operate to deprive people of important rights and protections that the law secures for them.

right of trial by jury as declared by the Constitution or statutes of the State shall be preserved to the parties inviolate."

And of course, our cases involving arbitration recognize the waiver of the right to go to court in the first instance that is inherent in consent to an arbitral process, *see Bd. of Ed. v. W. Harley Miller Inc., supra.*

■ However, as we stated in Syllabus Point 2 of *State ex rel. May v. Boles,* 149 W.Va. 155, 139 S.E.2d 177 (1964): "Courts indulge every reasonable presumption against waiver of a fundamental constitutional right and will not presume acquiescence in the loss of such fundamental right." *See also Woodruff v. Bd. of Tru. of Cabell Huntington,* 173 W.Va. 604, 611, 319 S.E.2d 372, 379 (1984), holding that the *West Virginia Constitution,* Article III, § 1 is "more stringent in its limitation on waiver [of fundamental constitutional rights] than is the federal constitution."

In the instant case, Friedman's *et al.* argue that the Federal Arbitration Act ("FAA"), 9 U.S.C. Sec. 2 (1947), categorically precludes Mr. Dunlap from invoking or relying to any degree upon his West Virginia state constitutional rights to seek justice in a public court and to have a jury trial on all issues so triable.

Interpreting the FAA, the Supreme Court has held that states may not single out arbitration for disfavor or special scrutiny simply because arbitration is a "different forum" than the traditional public court system. *See generally Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (holding that the FAA invalidated a state statute that required contractual terms regarding arbitration to be prominently displayed in the contract, but not requiring such display for other language).

■ Because complex issues of federalism are implicated, we do not believe that in deciding the instant case we should unnecessarily reach the issue of to what extent, under the FAA, West Virginia's constitutional policy giving her citizens the waiveable entitlement to seek justice in the public court system may permissibly factor into judicial scrutiny of the conscionability of a provision in a contract of adhesion purporting to waive that entitlement.[7]

Rather, because other issues are present in the instant case that permit us to rule without addressing this issue, we will for purposes of our decision give no weight to Mr. Dunlap's state constitutional rights to a jury trial in the public court system.

D.

■ Mr. Dunlap also asserts that the language of Friedman's purchase and financing agreement document contains, in connection with the document's arbitration provision, other impermissibly unconscionable limitations on his rights and remedies under laws that exist for the protection of the public. We shall primarily address two asserted limitations—punitive damages and class action relief.

■ Paragraph 14 of the Friedman's purchase and financing agreement document provides that "No arbitrator may make an award of punitive damages." As previously

---

7. In the criminal law context, in *State v. Neuman,* 179 W.Va. 580, 371 S.E.2d 77 (1988) this Court stated at Syllabus Point 5:

Certain constitutional rights are so inherently personal and so tied to fundamental concepts of justice that their surrender by anyone other than the accused acting voluntarily, knowingly, and intelligently would call into question the fairness of a criminal trial.

Similarly, in *State v. Eden,* 163 W.Va. 370, 377, 256 S.E.2d 868, 873 (1979), we stated:

... [W]aiver of a constitutional right is not implied to be lightly regarded, and if such a waiver is to be implied at all, it can only be in situations in which it is clear that the accused has not only a full knowledge of all facts and of

his rights, but a full appreciation of the effects of his voluntary relinquishment. [citations omitted.]

Absent concerns raised by the applicability of the FAA, we see no reason why a strict "knowing and intelligent waiver" standard should not ordinarily apply to the waiver of the rights to a jury trial in the public court system. (If a "knowing and intelligent" waiver of uninsured motorist's coverage is required for such a waiver to be effective, *see* Syllabus Point 2, *Riffle v. State Farm Mut. Auto. Ins. Co.,* 186 W.Va. 54, 410 S.E.2d 413 (1991), such a standard should logically apply to the waiver of important constitutional rights.)

562

noted, Mr. Dunlap's claims against Friedman's *et al.* include a request for statutory and common-law punitive and penalty damages that under West Virginia law would be potentially available to Mr. Dunlap (and other putative class members) if they were to prevail on a claim of systematic illegal, intentional, and/or fraudulent misconduct by Friedman's *et al.*[8]

It is axiomatic that when consumers, employees, etc. are the victims of illegal, wilfully and wantonly wrongful, and/or fraudulent misconduct, the social remedy of punitive and penalty damages may be a powerful tool—for the benefit of the plaintiff and for the benefit of society in general—"to punish the wrongdoer and to deter the commission of similar offenses in the future[,]" *Burgess v. Porterfield,* 196 W.Va. 178, 182, 469 S.E.2d 114–118 (1996).

In the instant case, the intended effect of the "no punitive damages" provision that is included in Paragraph 14 of Friedman's purchase and financing agreement document is that *every Friedman's customer* is deprived of their right to invoke and employ an important remedy provided by law to punish and deter illegal, willful, and grossly negligent misconduct—and that Friedman's would be categorically shielded from any liability for such sanctions, regardless of Friedman's level of wrongdoing.[9]

Mr. Dunlap also argues that his ability to fully pursue his legal rights and remedies is unconscionably limited by the terms of Friedman's purchase and financing agreement document, because Mr. Dunlap could not prosecute his claims for class action relief in arbitration.

Class action relief—including the remedies of damages, rescission, restitution, penalties, and injunction—is often at the core of the effective prosecution of consumer, employment, housing, environmental, and similar cases. In *McFoy v. Amerigas, Inc.,* 170

W.Va. 526, 533, 295 S.E.2d 16, 24 (1982), this Court stated that: "[i]n general, class actions are a flexible vehicle for correcting wrongs committed by large-scale enterprise upon individual consumers[;]." This apt and succinct description of a principal value of class action litigation is directly applicable to Mr. Dunlap's claims in the instant case.

In Mr. Dunlap's case, the total of $8.46 in insurance charges that Friedman's added to his purchase price by Friedman's is precisely the sort of small-dollar/high volume (alleged) illegality that class action claims and remedies are effective at addressing. In many cases, the availability of class action relief is a *sine qua non* to permit the adequate vindication of consumer rights.

As the United States Supreme Court stated in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 2246, 138 L.Ed.2d 689, 709 (1997), "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor (citations omitted)." *See also Riverside v. Rivera,* 477 U.S. 561, 575, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466, 480 (1986): " 'If the citizen does not have the resources, his day in court is denied him; the ... policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers.' 122 Cong.Rec. 33313 (1976) (remarks of Sen. Tunney)."

Thus, in the contracts of adhesion that are so commonly involved in consumer and employment transactions, permitting the proponent of such a contract to include a provision that prevents an aggrieved party from pursuing class action relief would go a long way toward allowing those who commit illegal

8. *W.Va.Code,* 46A–5–101 [1974] authorizes statutory penalty damages of $100.00 to $1,000.00 for each violation of the Consumer Protection Act. A plaintiff who proves common-law fraud may recover punitive damages, *Muzelak v. King Chevrolet,* 179 W.Va. 340, 345, 368 S.E.2d 710, 715 (1988).

9. *Cf. Smithson v. U.S. Fidelity & Guar. Co.,* 186 W.Va. 195, 202, 411 S.E.2d 850, 857 (1991), we held that an insurance company could not rely upon a claim that arbitration had been agreed to between the parties to attempt to insulate itself from damages for bad faith settlement practices.

activity to go unpunished, undeterred, and unaccountable.

Friedman's *et al.* do not dispute Mr. Dunlap's assertion that he would not be able to obtain punitive or penalty damages, or assert class action claims and obtain class relief, in an arbitration proceeding. Friedman's *et al.* claim, however, that the FAA's policy prohibiting states from disfavoring the arbitral forum prohibits Mr. Dunlap from asserting a claim that the arbitral forum is inadequate because of a lack of punitive damages or class action relief in that forum.

Friedman's points to the case of *Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) *supra*, where the Supreme Court upheld the enforced arbitration of a claim brought under the Federal Age Discrimination in Employment Act (ADEA). In *Gilmer*, the plaintiff had agreed when he registered as a securities dealer to use a specialized New York Stock Exchange (NYSE) arbitration forum for all disputes arising out of his employment. Before the Supreme Court, the plaintiff in *Gilmer* asserted as one of several generalized criticisms of the adequacy of arbitration in his case that class action relief was not available in arbitration. The Court's opinion in *Gilmer* principally focused on whether the FAA could cover statutory ADEA claims at all; the opinion also held in a brief discussion that a *possible* lack of class action relief in the NYSE arbitral forum would not itself necessarily render that forum inadequate to vindicate the particular ADEA claim made by the plaintiff in *Gilmer*. (The Court also referred to the NYSE forum as "conciliation." *Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. at 32, 111 S.Ct. at 1655, 114 L.Ed.2d at 41 (1991)).

We do not think that *Gilmer* is controlling in support of Friedman's *et al.*'s argument. The plaintiff in *Gilmer* raised an alleged lack of class action remedies in arbitration as part of a facial and generalized challenge to the applicability of the FAA to any and all claims arising under the ADEA. The Court in *Gil-*

*mer* did not rule out the possibility that "collective [class action] relief" could be available in the specialized NYSE arbitration proceedings. *Gilmer*, 500 U.S. at 32, 111 S.Ct. at 1655, 114 L.Ed.2d at 41 (1991). Additionally, the Court in *Gilmer* was interpreting a federal statute that the Court held would "continue to serve both its remedial and deterrent function" in the possible absence of class action relief. 500 U.S. at 28, 111 S.Ct. at 1653, 114 L.Ed.2d at 38 (1991). It does not appear that the plaintiff in *Gilmer* was, like Mr. Dunlap, an ordinary consumer or employee who had simply signed a boilerplate form; rather, the plaintiff in *Gilmer* was enrolling in a distinctive profession and actually agreed to use a specialized tribunal established to govern the conduct of that profession. The Court in *Gilmer* did not address the issue of whether preclusion of class action relief would have the effect of broadly shielding wrongdoers from full and effective accountability for their misconduct—which is the situation in the instant case. Moreover, a host of federal cases decided both prior to and following *Gilmer*, *see* note 3 *supra*, have recognized that if an arbitral forum substantially denies a party the rights and remedies that are provided by laws designed to protect and benefit the public, the FAA does not operate to require that those rights be surrendered. This rule must particularly apply to purported waivers of such rights and protections that are contained in a form contract of adhesion.

In the instant case, in contrast to *Gilmer*, a consumer is seeking to use well-settled principles of state law to challenge and remedy an allegedly widespread and illegal practice of defrauding thousands of consumers. The consumer signed a contract of adhesion containing provisions that would bar him from utilizing two remedies—punitive damages and class action relief—that are essential to the enforcement and effective vindication of the public purposes and protections of underlying the law.[10] For these reasons, we do not accept the argument that the *Gilmer*

---

10. We note that Rule 23 of the *West Virginia Rules of Civil Procedure*, which establishes the procedures for invoking the power of a court to

award class action relief, has the force and effect of a statute. Syllabus Point 3, *State v. Mason*, 157 W.Va. 923, 205 S.E.2d 819 (1974).

case prohibits Mr. Dunlap in the instant case from asserting a lack of class action relief as an unconscionable limitation of his remedies against Friedman's *et al.*[11]

■ Based on all of the foregoing, we hold that the Federal Arbitration Act, 9 U.S.C. Sec. 2 [1947] does not bar a state court that is examining exculpatory provisions in a contract of adhesion that if applied would prohibit or substantially limit a person from enforcing and vindicating rights and protections or from seeking and obtaining statutory or common-law relief and remedies

that are afforded by or arise under state law that exists for the benefit and protection of the public from considering whether the provisions are unconscionable—merely because the prohibiting or limiting provisions are part of or tied to provisions in the contract relating to arbitration.

In the instant case, we conclude that the prohibitions on punitive damages and class action relief that would be the result of the application of the provisions of Friedman's purchase and finance agreement are clearly unconscionable.[12]

11. *Gilmer* did not deal with the issue of punitive damages. Friedman's *et al.* argue that Mr. Dunlap does not have an inviolate right to such damages, and therefore cannot claim that the Friedman's contract's bar on such damages is unconscionable. Obviously, Mr. Dunlap has no *absolute* entitlement to such damages, but he does under West Virginia law have a legal entitlement to them, *if* he can prove their legal basis. The question is whether Friedman's—by placing limiting language in an adhesive contractual provision relating to arbitration—may absolutely and categorically shield itself (and others) from an important sanction that is provided by West Virginia law for the benefit of the public. Our answer is that Friedman's cannot do so.

12. Mr. Dunlap also claims that Friedman's purchase and financing agreement is unconscionable because it lacks even-handedness with respect to who may invoke the arbitral forum and who may use the court system, pointing out that Friedman's contract preserves Friedman's right to use the judicial system in the case of a default by Mr. Dunlap—to repossess the jewelry and to collect any deficiency, which are the primary enforcement tools of a seller/financer. Mr. Dunlap argues that Friedman's purchase and financing agreement document thus preserves for Friedman's the ability to use the court system to enforce the rights that are most important to Friedman's and at the same time gives Friedman's the ability to use the arbitral forum to limit a consumer's right to impose penalties and remedies against illegal conduct.

Confronted with a similar provision that retained significant rights to use the court system for a consumer lender, but denied the right to invoke the power of the court system to a borrower, we held in Syllabus Point 5, *Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 511 S.E.2d 854 (1998) that:

> Where an arbitration agreement entered into as part of a consumer loan transaction contains a substantial waiver of the borrower's rights, including access to the courts, while preserving the lender's right to a judicial forum, the agreement is unconscionable and,

therefore, void and unenforceable as a matter of law.

We agree that Friedman's retention of the right to use the courts for its most important remedies, at the same time that it denies that forum to Mr. Dunlap with respect to his most important remedies, meets our established criteria for unconscionability in the context of a contract of adhesion, and this reason provides additional and independently adequate grounds for our holding herein.

We also observe that neutrality in the selection and composition of any forum or tribunal is essential to the legal validity of contractual provisions providing for dispute resolution mechanisms, particularly when such provisions are placed in contracts of adhesion like the one signed by Mr. Dunlap. "A functional analysis of the West Virginia cases which do not favor arbitration demonstrates that this Court would not countenance an arbitration provision by which the parties agree that all disputes will be arbitrated by a panel chosen exclusively by one of the parties." *Bd of Ed. v. W. Harley Miller, Inc.*, 160 W.Va. 473, 479, 236 S.E.2d 439, 443 (1977). "The right to appoint one's own arbitrator ... is the essence of tripartite arbitration." *Anderson v. Nichols*, 178 W.Va. 284, 290 359 S.E.2d 117, 118 (1987). We have held that an impermissible structural unfairness in a tribunal, be it judicial or arbitral, would be presumed where the decision-maker is designated by one of the parties to a dispute and where the person making the decisions is compensated on a fee-per-case basis. *See State ex rel Shrewsbury v. Poteet*, 157 W.Va. 540, 202 S.E.2d 628 (1974) (justice of the peace system, criminal cases); *State ex rel. Reece v. Gies*, 156 W.Va. 729, 198 S.E.2d 211 (1973) (justice of the peace system, civil cases); *Haas v. County of San Bernardino*, 27 Cal.4th 1017, 119 Cal.Rptr.2d 341, 45 P.3d 280 (2002) (administrative law judges). Consideration of this neutrality principle has been recognized by courts addressing the enforceability of an arbitration requirement. *See, e.g., Hooters of America, Inc. v. Phillips*, 173 F.3d 933 (4th Cir.1999); *Toppings v. Meritech Mortg. Services*, 140 F.Supp.2d 683 (S.D.W.Va.2001); *Graham v. Scissor–Tail*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165 (1981).

## E.

■ Mr. Dunlap also asserts that Paragraph 14 of the Friedman's purchase and financing agreement document, that requires consumers to resolve disputes "[i]n accordance with the Commercial Rules of the American Arbitration Association" and adds that "[a]ll arbitrators or mediators' fees shall be equally divided between the parties," places such a high financial barrier in the path of any consumers seeking to vindicate their rights that most if not all consumers would be effectively discouraged from ever making the attempt. Mr. Dunlap argues that these costs and fees make arbitration under any terms effectively inaccessible to Mr. Dunlap and similarly situated consumers, substantially impeding their ability to "effectively vindicate" their rights. Mr. Dunlap argues that if the proponent of a contract of adhesion could impose excessive arbitration costs, the proponent could effectively shield themselves from potential liability for their wrongdoing in connection with the subject of the contract—and this would constitute an abuse of the arbitration process.

The Supreme Court has recognized that "[t]he existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her . . . rights in the arbitral forum." *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 90, 121 S.Ct. 513, 522, 148 L.Ed.2d 373, 383 (2000). "It is not only the costs imposed on the claimant but the *risk* that the claimant may have to bear substantial costs that deters the exercise of the constitutional right of due process." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 110, 99 Cal.Rptr.2d 745, 6 P.3d 669, 687 (Cal.2000) (holding that when an employer imposes mandatory arbitration as a condition of employment, the arbitration process generally cannot impose expenses on an employee that the employee would not have to bear in court) (emphasis in original).

The specter of high arbitration costs being used to prevent claimants from having reasonable access to justice was discussed in *Shankle v. B–G Maintenance Management of Colorado*, 163 F.3d 1230, 1234–1235 (10th Cir.1999):

> In order to invoke the procedure mandated by his employer, however, Mr. Shankle had to pay for one-half of the arbitrator's fees. Assuming Mr. Shankle's arbitration would have lasted an average length of time, he would have had to pay an arbitrator between $1,875 and $5,000 to resolve his claims. Mr. Shankle could not afford such a fee, and it is unlikely other similarly situated employees could either. The Agreement thus placed Mr. Shankle between the proverbial rock and hard place—it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum.[citation omitted.]

In refusing to compel arbitration because of high costs imposed by an arbitration clause, the U.S. Court of Appeals for the D.C. Circuit held that ". . . it is unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court." *Cole v. Burns Intern. Security Services*, 105 F.3d 1465, 1484 (D.C.Cir. 1997). Following *Cole*, the Eleventh Circuit found an arbitration clause unenforceable based on cost provisions similar to the ones in this case, requiring statutory claimants to pay AAA a $2,000 filing, plus a share of the arbitrator's fees. "[C]osts of this magnitude [are] a legitimate basis for a conclusion that the clause does not comport with statutory policy [enabling claimants to vindicate their statutory rights]." *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1062 (11th Cir.1998) (Cox, J., concurring for majority of court).[13] Additionally, the burden of

---

**13.** Similarly, the California Supreme Court, in striking an arbitration clause which imposed high costs on statutory claims, emphasized:

> . . . we are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or

his case. Under *Gilmer*, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an

showing the costs that would be imposed by an arbitral forum falls upon the party challenging the forum.

■ Based on the principles enunciated in the foregoing cases, we hold that provisions in a contract of adhesion that if applied would impose unreasonably burdensome costs upon or would have a substantial deterrent effect upon a person seeking to enforce and vindicate rights and protections or to obtain statutory or common-law relief and remedies that are afforded by or arise under state law that exists for the benefit and protection of the public are unconscionable; unless the court determines that exceptional circumstances exist that make the provisions conscionable. In any challenge to such a provision, the responsibility of showing the costs likely to be imposed by the application of such a provision is upon the party challenging the provision; the issue of whether the costs would impose an unconscionably

arbitrator when they would never be required to pay for a judge in court.

*Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 108, 99 Cal.Rptr.2d 745, 6 P.3d 669, 685 (2000). The Friedman's contract calls for resolution of disputes in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Mr. Dunlap asserts in his Petition that the AAA imposes substantial filing fees, and that its arbitrators charge hundreds of dollars an hour for both in-hearing time and for "study" time. The fees, he asserts, include a $500 minimum, non-refundable administrative fee; a $150 daily hearing fee; a $150 daily room rental fee; a $100 to $350 hourly arbitrator fee, for in-hearing as well as "study" time; processing fees, reporting service fees, and possible postponement fees; for an asserted total cost of arbitration approaching $1,000 per day. The U.S. District Court for the Western District of Virginia recently denied a motion to compel arbitration before the AAA, having found that the plaintiff would have to "pay an initial filing fee of $1250 to initiate her claim and a $750 case fee shortly thereafter. Camacho could not recover those fees, unless she ultimately prevailed on her claim." *Camacho v. Holiday Homes, Inc.*, 167 F.Supp.2d 892, 897 (W.D.Va.2001). And the federal district court for the Northern District of Illinois recently found that AAA arbitration costs were a basis for denying a motion to compel arbitration, noting that:

Phillips offers evidence from the AAA that she will be forced to pay upwards of $4,000 simply to file her claim. . . . Furthermore, the initial filing fee is far from the only cost involved in the arbitration. The AAA's Commercial Rules provide that the arbitrator's fees (which range from $750 to $5,000 per day, with an average of $1,800 per day in the Chicago area), travel expenses, rental of a hearing room, and other costs are borne equally by the parties, absent some agreement between the parties.

*Phillips v. Associates Home Equity Services*, 179 F.Supp.2d 840, 846 (N.D.Ill.2001). In *Ball v. SFX Broadcasting*, 165 F.Supp.2d 230, 240 (N.D.N.Y.2001), the Court stated:

[plaintiff] Christopher has submitted an affidavit in support of her opposition detailing the various costs which she can reasonably be expected to incur if she is compelled to submit her claims to arbitration. These include a

$1,000 per day arbitrator's fee, a $500 counterclaim fee, $150 per day hearing fees, and $150 per day postponement fees. [citations omitted]. *Cf. also Mendez v. Palm Harbor Homes, Inc.*, 111 Wash.App. 446, 45 P.3d 594 (2002) (holding that an arbitration agreement may be stricken when the party opposing arbitration reasonably shows in law or equity that prohibitive costs are likely to render the arbitral forum inaccessible). Friedman's *et al.* point out that AAA "*may*, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." Mr. Dunlap replies that "deferment or reduction of fees from AAA" applies solely to AAA administrative fees and does not extend to any of the other arbitration costs; that "deferral" means that Mr. Dunlap would have to pay the AAA later (as opposed to up front), but pay nonetheless; and that "may" connotes a lack of certainty, which in turn is compounded by the silence as to what constitutes "extreme hardship" in the eyes of AAA. Mr. Dunlap argues that AAA administrative fees, which themselves may be prohibitive when compared to the costs of the court system in court, are but a small portion of the financial burden that arbitration would impose on him. Friedman's *et al.* argue that AAA arbitrators "will customarily" hear the first day of arbitration for no additional fee, and asserts that "it is almost a certainty that the appointed arbitrator will serve without compensation." Mr. Dunlap responds that this "custom" is not required by AAA's rules and provides no relief to claimants whose claims will go beyond the first day; and that this "custom" does not extend to the preparation time which an arbitrator must put in prior to beginning the first day of hearing. In the *Camacho* decision, the court had the following to say about AAA deferral or reduction of fees:

Though Camacho may apply for fee deferral or reduction due to "extreme hardship," the parties stipulate that waiver of fees is extremely rare in practice. The AAA does not provide formal standards for granting hardship, and its accounting department actually determines who is afforded "extreme hardship" status.

167 F.Supp.2d at 897. We cannot see how Mr. Dunlap's evidence regarding company-wide wrongdoing could be heard in a day in any forum; it appears that Friedman's *et al.*'s premise is that an arbitrator could not hear evidence about company-wide misconduct.

impermissible burden or deterrent is for the court.[14]

▆ Applying the foregoing to the instant case, Friedman's *et al.* are correct that Mr. Dunlap's contentions as to the cost of arbitration to Mr. Dunlap are at best speculative and not well-supported in the record. Certainly the circuit court made no determination about the likely costs of arbitration. Consequently Mr. Dunlap's "excessive costs" argument for reversal of the circuit court's order regarding arbitration is not persuasive.[15]

F.

Based on all of the foregoing, we have concluded that as a matter of law that the provisions in Friedman's purchase and financing agreement document that severely limited Mr. Dunlap's rights and remedies were unconscionable.

▆ Friedman's *et al.* argue that if this Court finds that any provisions of Friedman's purchase and financing agreement unconscionably limit Mr. Dunlap's rights and remedies, this Court should remand the case to the circuit court with instructions to compel Mr. Dunlap to go to arbitration on his claims against Friedman's *et al.* under altered terms and conditions in which Mr. Dunlap could fully and effectively vindicate his rights in the arbitral forum. Presumably this would mean that the circuit court would order arbitration where Mr. Dunlap could obtain class action relief, and where the full range of statutory and common-law damages, penalties, and other legal and equitable remedies could be imposed on Friedman's *et al.*[16]

A recent court opinion rejected a defendant's offer to trim the unconscionable provisions of an arbitration clause:

In an effort to compel arbitration and dismiss the instant action against Drs. Porth and Kelly, United has expressed a willingness to waive the arbitration clauses' limitations that prevent an arbitrator from awarding extra contractual damages and punitive or exemplary damages. Principles of justice and fair play, however, lead to the conclusion that one party unilaterally cannot alter *post litem motam* terms of an agreement so that a case is dismissed .... The Court rejects United's attempted waiver.

*In re Managed Care Litigation*, 132 F.Supp.2d 989, 1001 (S.D.Fla.2000) (footnote and citations omitted). Another recent decision rejected a drafting party's attempt to rewrite an unconscionable arbitration clause, stating:

Flyer Printing points out that it offered to pay all the costs of arbitration notwithstanding the language of the agreement. Hill rejected this unilateral offer to amend the agreement, however, and we are not authorized to remake the parties' contract.

14. Thus provisions in an adhesion contract that required a party to deposit an unreasonably high bond before returning an item for warranty repairs, or to pay travel expenses for the other party's witnesses if a case is filed in court, would be subject to the same analysis.

15. Mr. Dunlap also argues that his opportunity to obtain an award of attorney fees would be impaired in arbitration, as opposed to in circuit court, where a statute provides for their award in Consumer Protection Act cases, *W.Va.Code*, 46A-5-104 [1994]. Our statutes and common law provide in some cases for the award of attorney fees to encourage the "private attorney general" enforcement of laws that protect the general welfare; and we have an established body of law on attorney fee awards. *See, e.g.,* Syllabus Point 4, *Bowling v. Ansted Chrysler–Plymouth–Dodge,* 188 W.Va. 468, 425 S.E.2d 144 (1992) (consumer fraud); Friedman's *et al.* say that attorney fees are as awardable in arbitration as they are in

circuit court. Given our resolution of the other issues in the instant case, we need not address Mr. Dunlap's claim regarding attorney's fees. We do observe that, entirely independent of the arbitration issue, a provision in a contract of adhesion that would operate to restrict the availability of an award of attorney fees to less than that provided for in applicable law would, under our decision today, be presumptively unconscionable. For example, if Friedman's purchase and financing agreement had stated: "attorney fees may not be awarded to the Buyer in a dispute with the Seller in any forum," that would be a presumptively unconscionable provision, if the dispute were one where a prevailing party is entitled to attorney fees under state laws for the benefit and protection of the public.

16. Were we to follow Friedman's suggestion, however, the circuit court would also have to address on remand the issues of arbitral costs and attorney fees.

*Flyer Printing Co. Inc. v. Hill*, 805 So.2d 829, 833 (Fla.App.2001).

In *Armendariz, supra*, 99 Cal.Rptr.2d 745, 6 P.3d at 697, the California Supreme Court stated:

> Moreover, whether an employer is willing, now that the employment relationship has ended, to allow the arbitration provision to be mutually applicable, or to encompass the full range of remedies, does not change the fact that the arbitration agreement as written is unconscionable and contrary to public policy. Such a willingness "can be seen, at most, as an offer to modify the contract; an offer that was never accepted. No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it." [citations omitted].

In evaluating Friedman's *et al.*'s argument that we should order the circuit court to compel arbitration, but under "conscionable" standards, we must again recognize the nature of the contract that is at issue—and the substance of the use to which Friedman's *et al.* have sought to put arbitration in the context of that contract.

Friedman's *et al.* are not asking this court to re-write a business contract that was knowingly entered into by two sophisticated parties—where a court doing equity might seek to put the parties where they really intended to be, by correcting a provision in the contract that has become unconscionable because of a mistake or changed circumstances.

Rather, Friedman's *et al.*, by tying substantively unconscionable exculpatory and limitation of liability provisions to an arbitration provision in a form contract of adhesion, has sought to unilaterally use (one could say "misuse") the honorable mechanism of arbitration—that has found a respected place in the commercial life of our nation—as a scheme or mechanism to shield itself from legal accountability for misconduct.

Under such circumstances, we think a court doing equity should not undertake to sanitize any aspect of the unconscionable contractual attempt.

Consequently, we conclude that the circuit court erred in refusing to exercise its ordinary jurisdiction over the claims made by Mr. Dunlap, and in instead requiring Mr. Dunlap to bring any disputes he has with Friedman's *et al.* to arbitration.

## IV.

### Conclusion

We conclude with a quotation from *Ting v. AT & T*, 182 F.Supp.2d 902, 938–939 (N.D.Cal.2002), which is applicable to the instant case:

> This lawsuit is not about arbitration [17] ... [Under the guise of requiring arbitration, the company] was actually rewriting substantially the legal landscape on which its customers must contend ... [the company] sought to shield itself from liability ... by imposing Legal Remedies Provisions that eliminate class actions, sharply curtail damages in cases of misrepresentation, fraud, and other intentional torts, cloak the arbitration process with secrecy and place significant financial hurdles in the path of a potential litigant. It is not just that [the company] wants to litigate in the forum of its choice—arbitration; it is that [the company] wants to make it very

17. We emphasize that the attempted avoidance of legally-required accountability for wrongdoing under the laws of West Virginia that Friedman's has attempted to accomplish with exculpatory arbitration-related provisions in a contract of adhesion in the instant case would be just as objectionable and unconscionable if that attempted avoidance arose from language that made no mention of arbitration. Also, we emphasize that our concern in the instant case is with the attempted prohibition or limitation of rights, remedies, and protections that are afforded for the benefit of the public by statutes and the common law; and we do not address the assertion, vindi-

cation, and enforcement of rights that arise purely from the contract itself. Finally, we note that Justice Neely, in *Bd. of Ed. v. Harley Miller, supra*, stated that arbitration clauses that were abusively included in contracts of adhesion, that were unconscionable, that were wholly inappropriate given the nature of the contract and could only have been intended to defeat just claims, or were oppressive under the circumstances, could not be held to have been truly "bargained for" and therefore should not be enforced. 160 W.Va. at 486, 236 S.E.2d at 443. This standard, applied to the facts of the instant case, also supports this Court's decision.

difficult for anyone to effectively vindicate her rights, even in that forum. That is illegal and unconscionable[.]

The requested writ of prohibition is granted and this case is remanded for further proceedings consistent with this opinion.[18]

Writ Granted.

---

**18.** Mr. Dunlap also argues that American Bankers cannot compel Mr. Dunlap to go to arbitration with his claims against American Bankers, because they are neither a party to nor referred to in the purchase and financing agreement document. We need not reach this issue, but we observe that this Court recently stated:

> Despite the recognized exception to the rule requiring express assent to require arbitration, there is equally "[p]ersuasive authority ... that a ... court is not required to compel arbitration between parties who have not agreed to such arbitration."

*State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 511 S.E.2d 134, 138, 139, 204 W.Va. 23, 27–28 (1998).