FANNIE LEE TILLMAN AND SHIRLEY RICHARDSON, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS v. COMMERCIAL CREDIT LOANS, INC., COMMERCIAL CREDIT CORPORATION, CITIGROUP, INC., CITICORP, INC., CITIFINANCIAL, INC., AND CITIFINANCIAL SERVICES, INC., DEFENDANTS

No. COA05-924

(Filed 6 June 2006)

**1. Appeal and Error— appealability—denial of motion to compel arbitration—substantial right**

The denial of a motion to compel arbitration is not a final judgment but is immediately appealable because it involves a substantial right.

**2. Arbitration and Mediation— unconscionability—standards**

The interpretation of arbitration agreements is governed by contract principles and the parties may specify the rules under which arbitration will be conducted, but are not bound by unconscionable provisions.

**3. Arbitration and Mediation— costs—not prohibitive—agreement not unconscionable**

The trial court erred by concluding that the plaintiffs' arbitration costs were prohibitive and that the arbitration clause was unconscionable and unenforceable where plaintiffs did not fairly measure arbitration costs against the costs of litigation and appeal.

**4. Arbitration and Mediation— class action precluded—not unconscionable**

An arbitration clause was not unconscionable because it precluded a class action, and the court erred by so finding.

**5. Arbitration and Mediation— mutuality—North Carolina standard**

The trial court erred by finding an arbitration clause to be unconscionable based on a mutuality of obligations analysis contrary to North Carolina contract law.

Judge HUNTER dissenting.

Appeal by defendants from orders entered 28 September 2004 and 20 January 2005 by Judge Ronald L. Stephens in Vance County Superior Court. Heard in the Court of Appeals 15 March 2006.

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

*Jones Martin Parris & Tessener Law Offices, P.L.L.C., by John Alan Jones and G. Christopher Olson, for plaintiffs-appellees.*

*Moore & Van Allen, PLLC, by Jeffrey M. Young, and Rogers & Hardin LLP, by Richard H. Sinkfield and Christopher J. Willis, Atlanta, Georgia, pro hac vice, for defendants-appellants.*

*Ellis & Winters LLP, by Matthew W. Sawchak, for Amicus Curiae American Financial Services Association.*

*Wallace & Graham, P.A., by Mona Lisa Wallace and John S. Hughes, and The Jackson Law Group, PLLC, by Gary W. Jackson, for Amicus Curiae The North Carolina Academy of Trial Lawyers.*

*Carlene McNulty, for Amicus Curiae North Carolina Justice Center.*

*Mallam J. Maynard, for Amicus Curiae Financial Protection Law Center.*

*Richard Frankel and F. Paul Bland, Jr., for Amicus Curiae Trial Lawyers for Public Justice, Washington, D.C.*

TYSON, Judge.

Commercial Credit Loans, Inc., Commercial Credit Corporation, Citigroup, Inc., Citicorp, Inc., Citifinancial, Inc., and Citifinancial Services, Inc. (collectively, "defendants") appeal from order entered 20 January 2005 denying defendants' motion to compel arbitration, and from order entered 28 September 2004 denying in part defendants' motion to compel and granting in part Fannie Lee Tillman's and Shirley Richardson's, on behalf of all others similarly situated (collectively, "plaintiffs"), motion for protective order. We reverse and remand.

## I. Background

Plaintiffs are North Carolina borrowers who obtained financing from or through defendant Commercial Credit Loans, Inc. ("Commercial Credit"). Plaintiffs asserted a class action suit against defendants in the Vance County Superior Court in June 2002 and alleged defendants acted unlawfully in connection with mortgage loans defendants made to plaintiffs. Plaintiffs complain Commercial Credit sold them single premium credit insurance they did not need or want without disclosing such insurance was optional, and that Commercial Credit was the beneficiary of the policies.

Credit insurance was purchased by plaintiffs in connection with their mortgage loans and benefits are paid to the lender if a covered

event occurs. Credit insurance coverages include: (1) credit life, which pays off the loan in the event of the borrower's death; (2) credit disability, which makes the monthly mortgage payments if the borrower becomes disabled; and (3) credit involuntary unemployment, which makes the monthly mortgage payments if the borrower becomes involuntarily unemployed. Single premium credit insurance requires the borrower to pay the entire expected term of coverage at the time the mortgage loan is closed. The up-front premium is financed as a part of the loan.

Plaintiffs' loan agreements contain an arbitration provision. The provision is contained in an outlined box with the heading:

**"READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO OBTAIN REDRESS THROUGH COURT ACTION."**

The arbitration provision provides:

Upon written request by either party that is submitted according to the applicable rules for arbitration, any Claim, except those specified below in this Provision, shall be resolved by binding arbitration in accordance with (i) the Federal Arbitration Act; (ii) the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association ("Administrator"); and (iii) this Provision, unless we both agree in writing to forego arbitration.

This provision excludes two types of claims from arbitration: (1) "Any action to effect a foreclosure to transfer title to the property being foreclosed;" and (2) "Any matter where all parties seek monetary damages in the aggregate of $15,000 or less in total damages (compensatory and punitive), costs, and fees." The provision further provides:

No Class Actions/No Joinder of Parties. You agree that any arbitration proceeding will only consider Your Claims. Claims by or on behalf of other borrowers will not be arbitrated in any proceeding that is considering Your Claims. Similarly, You may not join with other borrowers to bring Claims in the same arbitration proceeding, unless all of the borrowers are parties to the same Credit Transaction.

The arbitration provision requires the party initiating the arbitration to pay the first $125.00 toward arbitration costs. Commercial Credit agreed to pay "all other costs for the arbitration proceeding up to a max-

imum of one day (8 hours) of hearings." It further provides, "All costs of the arbitration proceeding that exceed one day of hearings will be paid by the non-prevailing party."

The arbitration agreements gives either party the right to appeal the arbitrator's award to a three-arbitrator panel "which shall reconsider de novo any aspect of the initial award requested by the appealing party." The appealing party is required to pay the costs of initiating the appeal. The non-prevailing party is required to pay all costs, fees, and expenses of the appeal and may be required to reimburse the prevailing party for the cost of initiating the appeal.

Defendants filed a motion to compel arbitration in the Vance County Superior Court and was heard on 16 December 2004. The trial court made findings of fact and conclusions of law and denied defendants' motion. Defendants appeal.

## II. Issues

Defendants argue the trial court erred by: (1) concluding plaintiffs could avoid the agreements to arbitrate because of the alleged costs of arbitration; (2) concluding the parties' arbitration agreements were unenforceable because it precludes class actions; and (3) imposing a "mutuality" requirement on arbitration agreements that does not exist under North Carolina law.

## III. Standard of Review

[1] An order denying defendants' motion to compel arbitration is not a final judgment and is interlocutory. However, an order denying arbitration is immediately appealable because it involves a substantial right, the right to arbitrate claims, which might be lost if appeal is delayed. *Burke v. Wilkins*, 131 N.C. App. 687, 688, 507 S.E.2d 913, 914 (1998).

A dispute can only be settled by arbitration if a valid arbitration agreement exists. The party seeking arbitration must show that the parties mutually agreed to arbitrate their disputes. The trial court's findings regarding the existence of an arbitration agreement are conclusive on appeal where supported by competent evidence, even where the evidence might have supported findings to the contrary. However, the trial court's determination of whether a dispute is subject to arbitration is a conclusion of law that is reviewable *de novo* on appeal.

*Revels v. Miss Am. Org.*, 165 N.C. App. 181, 188-89, 599 S.E.2d 54, 59 (quoting *Slaughter v. Swicegood*, 162 N.C. App. 457, 461, 591 S.E.2d 577,

580 (2004)) (internal citations and quotations omitted), *disc. rev. denied*, 359 N.C. 191, 605 S.E.2d 153 (2004).

## IV. Enforceability of Arbitration Agreements

**[2]** "North Carolina has a strong public policy favoring arbitration." *Red Springs Presbyterian Church v. Terminix Co.*, 119 N.C. App. 299, 303, 458 S.E.2d 270, 273 (1995). "The essential thrust of the Federal Arbitration Act, which is in accord with the law of our state, is to require the application of contract law to determine whether a particular arbitration agreement is enforceable; thereby placing arbitration agreements 'upon the same footing as other contracts.'" *Futrelle v. Duke University*, 127 N.C. App. 244, 247-48, 488 S.E.2d 635, 638 (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 134 L. Ed. 2d 902, 909 (1996)), *disc. rev. denied*, 347 N.C. 398, 494 S.E.2d 412 (1997).

"The interpretation of the terms of an arbitration agreement are governed by contract principles and parties may specify by contract the rules under which arbitration will be conducted." *Trafalgar House Construction v. MSL Enterprises, Inc.*, 128 N.C. App. 252, 256, 494 S.E.2d 613, 616 (1998). As a general rule, "[p]ersons entering contracts of insurance, like other contracts, have a duty to read them and ordinarily are charged with knowledge of their contents." *Nationwide Mut. Insur. Co. v. Edwards*, 67 N.C. App. 1, 8, 312 S.E.2d 656, 661 (1984).

Plaintiffs argue they are not bound by the provisions of the agreements to arbitrate because they are unconscionable. Unconscionability is an affirmative defense and the party asserting the defense bears the burden of proof. *Rite Color Chemical Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 20, 411 S.E.2d 645, 649 (1992). In assessing unconscionability, a court is to consider "all the facts and circumstances of a particular case." *Brenner v. School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981). This Court has previously held that "to find unconscionability there must be an absence of meaningful choice on part of one of the parties [procedural unconscionability] *together with* contract terms which are unreasonably favorable to the other [substantive unconscionability]." *Rite Color Chemical Co.*, 105 N.C. App. at 20, 411 S.E.2d at 649 (quoting *Martin v. Sheffer*, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991)) (emphasis in original).

Procedural unconscionability involves 'bargaining naughtiness' in the formation of the contract, i.e., fraud, coercion, undue influence, misrepresentation, inadequate disclosure. Substantive unconscionability . . . involves the harsh, oppressive, and one-sided terms

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

of a contract, i.e., inequality of the bargain. The inequality of the bargain, however, must be so manifest as to shock the judgment of a person of common sense, and . . . the terms . . . so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.

*King v. King*, 114 N.C. App. 454, 458, 442 S.E.2d 154, 157 (1994) (citation omitted); *see also Brenner*, 102 N.C. App. at 805, 403 S.E.2d at 557.

The trial court found defendants' arbitration clause to be unconscionable and unenforceable due to the combination of: (1) "prohibitively high arbitration costs" and the risk of "excessive arbitration and appeal costs;" (2) its class action waiver; and (3) its "excessively one-sided" nature which "lacks mutuality."

## V. Arbitration Costs

[3] Defendants argue the trial court erred by concluding plaintiffs were not bound by the arbitration agreements because of the alleged costs of arbitration. We agree.

The United States Supreme Court examined the issue of arbitration costs in *Green Tree Financial v. Randolph*, 531 U.S. 79, 148 L. Ed. 2d 373 (2000). In *Green Tree Financial*, the Court addressed "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." 531 U.S. at 82, 148 L. Ed. 2d at 378. The Court acknowledged that "the existence of large arbitration costs *could* preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at 90, 148 L. Ed. 2d at 383 (emphasis supplied).

The respondent in *Green Tree Financial* argued she was unable to vindicate her statutory rights in arbitration because "the arbitration agreement's silence with respect to costs and fees creates a 'risk' that she will be required to bear prohibitive arbitration costs if she pursues her claims in an arbitral forum[.]" 531 U.S. at 90, 148 L. Ed. 2d at 383. The Court stated, "where . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92, 149 L. Ed. 2d at 384. The Court held that the record contains "hardly any information" regarding costs of arbitration, and the " 'risk' that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91, 149 L. Ed. 2d at 384.

## TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

In *Bradford v. Rockwell Semiconductor Systems Inc.*, 238 F.3d 549, 556 (4th Cir. 2001), the United States Court of Appeals for the Fourth Circuit considered an express fee-splitting provision in an arbitration agreement and held:

> We believe that the appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, *the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims.*

Following the Supreme Court's decision in *Green Tree Financial*, the Fourth Circuit concluded the respondent "failed to demonstrate any inability to pay the arbitration fees and costs, much less prohibitive financial hardship, to support his assertion that the fee-splitting provision deterred him from arbitrating his statutory claims." *Id.* at 558. The Court further stated:

> The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are "too high." Rather, an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, *measured against a baseline of the claimant's expected costs for litigation* and his ability to pay those costs.

*Id.* at 556, n.5 (emphasis supplied).

> Here, with regard to arbitration costs, the trial court concluded:

> 4. The Commercial Credit arbitration clause, as written, exposes borrowers to prohibitively high arbitration costs. The arbitration clause exposes consumers to arbitrator fees, based upon the AAA average for North Carolina, of $1,225.00 per day *after the first eight hours of hearings.* For example, a three-day arbitration with an arbitrator charging the average AAA hourly fee in North Carolina could cost a borrower $2,450.00 plus costs and attorneys' fees. If the arbitrator charged the high end of the range in North Carolina, a borrower could face arbitration fees of $4,760.00 for a three-day arbitration, plus costs and attorneys' fees. (Emphasis supplied).

> 5. Defendant's arbitration clause provides for a <u>de novo</u> appeal from the initial arbitration proceeding. The <u>de novo</u> appeal would

be to a three-arbitrator panel. The arbitration clause contains a fee-shifting provision with respect to costs of that de novo appeal. That is, *the party that loses the appeal* "shall pay all costs, fees, and expenses of the appeal proceeding" even if that party had won the initial arbitration proceeding. Thus, a consumer seeking to vindicate her rights through the arbitration process faces the prospect of paying not only arbitrator fees for the initial arbitration proceeding exceeding eight hours, but also much greater costs associated with the de novo appeal. For example, a two-day appeal could cost a borrower $7,350.00 in arbitrator fees alone, with a three-arbitrator panel charging the AAA average arbitrator fee. These appeal costs would be borne by a borrower even if the borrower had prevailed at the initial arbitration proceeding. (Emphasis supplied).

With regard to litigation costs, the trial court found:

15. Based upon the 1998 North Carolina Bar Association Economic Survey, the most recent survey published, the average hourly rate for attorneys working on litigation matters such as this is between $150.00-$250.00 per hour.

. . . .

19. To successfully prosecute a complex case, including a class action such as this one, a law firm would likely need the assistance of expert witnesses. The hourly fees of experts in the fields of economics, lending practices, and credit insurance can range from $150.00 to $300.00 per hour, plus expenses. In complex cases, litigation costs and expenses, including deposition costs, travel expenses, and expert witness fees, can easily run into thousands of dollars. The class action mechanism allows persons with relatively small claims to pool their resources and have those litigation expenses and costs shared among all class members. . . .

The trial court concluded:

6. The fees and costs associated with both the initial arbitration proceeding and any appeal to a three-arbitrator panel are beyond what would be incurred by a civil litigant in the court system. These fees and costs may deter a substantial number of consumers from pursuing valid claims. The cost-shifting ("loser pays") provisions of the arbitration clause further serve as a substantial deterrent to consumers attempting to pursue claims against Defendant.

Plaintiffs' counsel filed an affidavit in which he stated, "In complex cases such as this, costs and expenses advanced by our law firm can

total more than $150,000.00." Plaintiffs argued to the trial court that the costs involved in arbitrating their claims "represent a cost that would not be incurred in civil court." Plaintiffs argued that if this case were tried in civil court it would be certified as a class action and the costs of the lawsuit, if it was successful, would be shared among the class members and taxed against defendants. This arrangement "places the risk associated with the case on the law firm." *See* North Carolian State Bar Revised Rules of Professional Conduct, Rule 1.5(c) (2006) ("A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law."). Even though plaintiffs may sign a contingency agreement with their attorneys, they are still liable for the *costs* of the litigation. The State Bar ruled in RPC 124 (January 17, 1992) ("RPC 124") that "an attorney may never ethically agree to be ultimately responsible for the costs of litigation." An attorney cannot agree with his or her client to bear all or some of the costs of litigation. Under the arbitration agreements, after paying the $125.00 initiation fee plaintiffs are only liable for the costs if the arbitration exceeds "one day (8 hours) of hearings." The costs of filing suit in the North Carolina superior courts is $95.00. N.C. Gen. Stat. § 7A-305 (2005). Plaintiffs' counsel stated in his affidavit that advanced costs and expenses could total more than $150,000.00. The costs plaintiffs would bear for litigation would likely be higher than the costs they would bear for arbitration.

Plaintiffs also failed to address or quantify the costs of litigation associated with this lawsuit if they *were not* successful in the superior court or the costs of an appeal. Their argument solely focuses on the costs of arbitration only if the arbitration exceeds "one day (8 hours) of hearings" and plaintiffs were the non-prevailing party and sought a *de novo* appeal. Plaintiffs costs comparison between arbitration and civil litigation also presumes plaintiffs would be the non-prevailing party in arbitration and would be the prevailing party in litigation. This argument is an "apples to oranges" comparison. Plaintiffs also failed to equate the time and costs between a "bench trial" and arbitration hearing, both lasting up to eight hours.

Plaintiffs' argument is premised upon the same kind of "risk" of prohibitive arbitration costs the Supreme Court addressed in *Green Tree Financial*. Plaintiffs failed to fairly measure the costs of arbitration "against a baseline of the claimant's expected costs for litigation." *Bradford*, 238 F.3d at 556, n.5. "Speculative assertions . . . do not constitute competent evidence." *MCC Outdoor, LLC v. Town of Franklinton Bd. of Comm'rs*, 169 N.C. App. 809, 815, 610 S.E.2d 794,

798, *disc. rev. denied*, 359 N.C. 634, 616 S.E.2d 540 (2005). Based on the evidence presented and the lack of equal comparisons between arbitration and trial and appeals, the trial court erred in concluding plaintiffs' costs of arbitration were "prohibitive."

## VI. Preclusion of Class Actions

[4] Defendants argue the trial court erred by concluding the arbitration clause was unenforceable because it precludes class actions. We agree.

Plaintiffs conceded, and the trial court acknowledged, that a class action waiver in an arbitration agreement does not, in and of itself, render the arbitration agreements unenforceable. *See Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002) (A class action waiver "cannot by itself suffice to defeat the strong congressional preference for an arbitral forum.").

The trial court accepted plaintiffs' proposition that without the ability to join claims, they are deterred from bringing lawsuits against defendants due to the amount of money at stake being too small to justify an attorney's involvement. This proposition and the trial court's conclusion ignores the fact that the consumer protection statute underlying plaintiffs' claims provides for the recovery of plaintiffs' costs and attorney's fees if plaintiffs prevail.

Plaintiffs' complaint seeks damages against defendants for violations of N.C. Gen. Stat. § 75-1.1. N.C. Gen. Stat. § 75.16.1 (2005) provides that "[i]n any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may . . . allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party."

In *Snowden v. CheckPoint Check Cashing*, the United States Court of Appeals for the Fourth Circuit expressly and explicitly rejected the precise argument plaintiffs assert and the trial court accepted here:

> We also reject Snowden's argument that the Arbitration Agreement is unenforceable as unconscionable because without the class action vehicle, she will be unable to maintain her legal representation given the small amount of her individual damages. Snowden's argument is unfounded in light of: (1) the fact that attorney's fees are recoverable by a prevailing plaintiff in a TILA action, 15 U.S.C. § 1640(a)(3), and a civil RICO action, 18 U.S.C. § 1962(c); and (2) the fact that, although the Arbitration Agreement provides that each party shall bear the expense of their respective attorneys'

fees regardless of which party prevails in the arbitration, such provision expressly *does not apply if it is* "*inconsistent with the applicable law* . . . ."

290 F.3d 631, 638 (4th Cir. 2002) (emphasis supplied), *cert. denied*, 537 U.S. 1087, 154 L. Ed. 2d 631 (2002). Like in *Snowden*, the arbitration agreements at bar provide, "Each party shall pay his/her own attorney . . . fees and expenses, *unless otherwise required by law*." (Emphasis supplied).

The United States Court of Appeals for the Eleventh Circuit adopted the Fourth Circuit's reasoning in *Jenkins v. First American Cash Advance of Georgia*, 400 F.3d 868 (11th Cir. 2005), *cert. denied*, —— U.S. ——, 164 L. Ed. 2d 132 (2006).

> The Arbitration Agreements expressly permit Jenkins and other consumers to recover attorneys' fees and expenses "if allowed by statute or applicable law." Under the Georgia RICO statute, a prevailing plaintiff may be awarded attorney's fees. . . . Jenkins, therefore, can presumably recover attorneys' fees and costs if she prevails in arbitration on her Georgia RICO claim.

*Id.* at 878.

The trial court's conclusion regarding class action waivers is contrary to the great majority of federal and state courts that have examined and ruled upon this issue. *See Snowden*, 290 F.3d at 638 (rejecting the argument "that the Arbitration Agreement is unenforceable as unconscionable because without the class action vehicle, she will be unable to maintain her legal representation given the small amount of her individual damages"); *Johnson*, 225 F.3d at 369 (holding arbitration "clauses are effective even though they may render class actions to pursue statutory claims under the TILA or the EFTA unavailable"); *Livingston v. Associates Finance, Inc.*, 339 F.3d 553, 559 (7th Cir. 2003) ("The Arbitration Agreement at issue here explicitly precludes the [borrowers] from bringing class claims or pursuing 'class action arbitration,' so we are therefore 'obliged to enforce the type of arbitration to which these parties agreed, which does not include arbitration on a class basis.' "); *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 379 F.3d 159, 175 (5th Cir. 2004) (" . . . the arbitration clause does not leave the plaintiffs without remedies or so oppress them as to rise to the level of unconscionability."); *Rosen v. SCIL, LLC*, 799 N.E.2d 488, 494 (Ill. App. 2003) ("We find the arbitration provision enforceable despite its prohibition on class actions. We further note that the question of whether an

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

individual is entitled to participate in a class action as a matter of right is a question of public policy, which we suggest should be addressed by the legislature."); *Med Center Cars, Inc. v. Smith*, 727 So.2d 9, 20 (Ala. 1998) ("to require class-wide arbitration would alter the agreements of the parties, whose arbitration agreements do not provide for class-wide arbitration"); *Rains v. Foundation Health Systems*, 23 P.3d 1249, 1253 (Colo. App. 2001) ("arbitration clauses are not unenforceable simply because they might render a class action unavailable"); *Edelist v. MBNA America Bank*, 790 A.2d 1249, 1261 (Del. Super. Ct. 2001) (finding that, because "the surrender of [the] class action right was clearly articulated in the arbitration amendment[,] the Court finds nothing unconscionable about it and finds the bar on class actions enforceable"); *AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 200 (Tex. App. 2003) (enforcing arbitration clause which prohibited class action claims, stating that "there is no entitlement to proceed as a class action").

These courts and others expressly recognized that class action waivers in arbitration provisions do not "necessarily choke off the supply of lawyers willing to pursue claims on behalf of debtors." *Johnson v. West Suburban Bank*, 225 F.3d 366, 374 (3rd Cir. 2000). The great majority of federal and state jurisdictions who have addressed this issue are directly contrary to the trial court's findings and conclusions. Upon *de novo* review, the trial court's conclusion that plaintiffs would be deterred from bringing their claims against defendants due to the class action waiver is erroneous in light of the express arbitration provisions and plaintiffs' assertion of claims under N.C. Gen. Stat. §§ 75-1.1 and 75.16.1.

## VII. Mutuality Requirement

[5] Defendants contend the trial court erred by concluding a mutuality requirement must exist in arbitration agreements under North Carolina law. We agree.

The trial court concluded:

8. The Commercial Credit arbitration clause used in North Carolina since February 12, 1996 is one-sided and lacks mutuality, in that it preserves for the lender the right to pursue almost all claims it would choose to pursue in civil court while denying that right to borrowers in most instances. The arbitration clause contains exceptions for foreclosure actions and claims in which the amount sought, including costs and attorneys' fees is under $15,000.00. This portion of the clause preserves for the lender the only remedies it

would be likely to assert against borrowers—foreclosure and collection actions.

The trial court's order cites cases from the United States Court of Appeals for the Ninth Circuit, the United States District Court for the Southern District of Georgia, the Supreme Court of Tennessee, the Supreme Court of Arkansas, and the Supreme Court of Appeals of West Virginia to support its conclusion. No North Carolina or other controlling precedents or statutes were cited to support this conclusion.

"Mutuality of promises means that promises to be enforceable must each impose a legal liability upon the promisor. Each promise then becomes a consideration for the other." *Wellington v. Dize Awning & Tent Co.*, 196 N.C. 748, 751, 147 S.E. 13, 14 (1929). Under North Carolina law, "mutuality" merely requires consideration on each side of a contract. Mutuality does not require that each of the contract terms must apply equally to both parties to be enforceable. *Id.*

Want of mutuality is merely one form of want of consideration. But a single consideration may support several promises; it is not necessary that each promise have a separate consideration. Hence, a covenant which imposes obligations upon one party only may be enforceable if it is part of an entire contract which is supported by a sufficient consideration.

*Id.*

Likewise, the Restatement (Second) of Contracts § 79 (1979) provides:

If the requirement of consideration is met, there is no additional requirement of:

(a) a gain, advantage, or benefit to the promisor or a loss, disadvantage, or detriment to the promisee; or

(b) equivalence in the values exchanged; or

(c) "mutuality of obligation."

Even under a "mutuality of obligation" analysis, we fail to see how the exclusions in the arbitration agreements are not mutual. The language of the arbitration provision states, "The following types of matters will not be arbitrated. This means that *neither one of us* can require the other to arbitrate." (Emphasis supplied). The first exclusion covers claims "where all parties seek monetary damages . . . of $15,000 or less."

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[177 N.C. App. 568 (2006)]

This exclusion applies equally to both plaintiffs and defendants. If defendants had asserted a lawsuit in civil court for damages of $15,000.00 or more against plaintiffs on their promissory notes, plaintiffs can compel defendants into arbitration under their agreements.

The second exclusion from arbitration for "[a]ny action to effect a foreclosure to transfer title to the property being foreclosed" is also mutual. Neither party can force the other to arbitrate such a claim. Further, the fact that the North Carolina superior courts have "exclusive jurisdiction" over any action affecting title to land is a good reason to exclude foreclosure actions from arbitration agreements. N.C. Gen. Stat. § 43-1 (2005).

The Maryland Court of Appeals recently held that an arbitration agreement that excluded foreclosure proceedings was not unconscionable. *Walther v. Sovereign Bank*, 872 A.2d 735, 748-49 (Md. 2005).

> Maryland foreclosure proceedings, like those of both Kentucky and South Carolina, do not act solely to protect the interests of the mortgage lender against a defaulting debtor but instead provide protections for both sides. We agree with these other jurisdictions and their findings that the act of a mortgage lender in providing certain exceptions for itself in the arbitration agreement, such as the ability to pursue foreclosure proceedings in a judicial forum, does not in and of itself make the arbitration agreement unconscionable where the mortgage-debtor/borrower is not provided with identical exceptions to the arbitration agreement. The arbitration agreement at issue, which includes exceptions to that agreement that enable the mortgage lender, presently Sovereign Bank, to pursue certain judicial remedies including foreclosure, is not made unconscionable where petitioners are not provided with identical exceptions to the arbitration agreement.

*Id.* at 749 (internal citations omitted). The Maryland Court of Appeals' rationale is persuasive and applicable to the issue before us. Here, the foreclosure exception in the arbitration agreements applies equally to both parties.

Under *de novo* review, the trial court erred in applying a "mutuality of obligations" to the arbitration agreements that is contrary to North Carolina contract law. *Wellington*, 196 N.C. at 751, 147 S.E.2d at 14. Further, plaintiffs failed to show how the two exclusions contained in the arbitration agreements were not equally binding upon both parties and were not mutual obligations.

### VIII.  Conclusion

The trial court erred by concluding the arbitration agreements was unconscionable. Plaintiffs failed to establish the costs of arbitration are "prohibitive." The arbitration agreements are not unenforceable because they preclude class actions. The trial court erred in applying a requirement of mutuality to the arbitration agreements that is contrary to North Carolina law. Viewed separately or together, these three provisions of the arbitration agreements do not render them unconscionable.

The trial court's order denying defendants' motion to compel arbitration is reversed. This case is remanded to the trial court for entry of an order granting defendants' motion to compel arbitration.

Reversed and Remanded.

Judge McCULLOUGH concurs.

Judge HUNTER dissents by separate opinion.

HUNTER, Judge, dissenting.

Because I disagree with the majority's position that the trial court erred in finding the arbitration agreement to be unconscionable, I respectfully dissent.

The majority opinion does not include numerous and detailed findings of fact made by the trial court, most of which are uncontroverted. Because the findings are necessary for a full understanding of the issues before this Court, I recite them here:

1. Plaintiffs, Fannie Lee Tillman and Shirley Richardson, filed this putative class action lawsuit pursuant to Rule 23 of the North Carolina Rules of Civil Procedure on June 24, 2002. Plaintiffs seek to represent a class of borrowers who obtained loans from Defendant Commercial Credit Loans, Inc. (now known as and hereinafter referred to as "CitiFinancial Services, Inc." or "Defendant") and who were sold single-premium credit insurance by Defendant in connection with their loans.

2. Single-premium credit insurance ("SPCI") is a type of credit insurance sold by a lender to a borrower in which the borrower is charged the entire insurance premium at the time the underlying loan is originated, with the premium being financed into and over the life of the loan. As a result of the premium charge being

financed, the loan principal is increased by the amount of the premium charge, and the borrower pays interest on the increased principal, including the insurance premium, for the entire life of the loan. Furthermore, the increase in loan principal leads to a concomitant increase in certain loan costs such as origination fees and points. With the passage of the North Carolina Predatory Lending Law, N.C. Gen. Stat. § 24-1.1E, it has been unlawful to finance the premium costs of single-premium credit insurance since July 1, 2000.

3. Plaintiff Fannie Lee Tillman obtained a loan from Commercial Credit Loans, Inc. (hereafter "Commercial Credit") on September 22, 1998. Ms. Tillman's loan included single-premium credit life insurance with a premium costing $1,058.80 and single-premium credit disability insurance with a premium costing $1,005.95. The amount financed in connection with this loan was $18,253.68, with $2,064.75 attributable to single-premium credit insurance. The interest rate on the loan was over 15%. The loan proceeds were used, in part, to pay off another Commercial Credit loan which had been originated eight months earlier, in January 1998. Ms. Tillman was also sold credit insurance, with premiums costing $1,799.95, in connection with the earlier Commercial Credit loan. The interest rate on the earlier loan was over 20%.

4. Plaintiff Fannie Lee Tillman has limited financial resources. She works as a sewer at Wayne Industries in Archdale, North Carolina, and her take-home pay is approximately $258.00 per week after taxes. She has worked at Wayne Industries for roughly 18 years, and the $8.50 hourly rate she currently receives is the most she has earned at that job. Ms. Tillman receives $285.60 per month in pension benefits from her deceased husband's employer. She receives $1,063.00 per month in Social Security benefits. Ms. Tillman has no other sources of income. Ms. Tillman's most significant asset is her home in High Point, North Carolina. That home is worth approximately $60,000.00 to $65,000.00 and is encumbered by a first and second mortgage with balances which are roughly equal to the value of the home. Ms. Tillman is 66 years of age. She completed the seventh grade but then had to begin working full-time to help support her family. Ms. Tillman does not have a retirement plan or any significant savings. The balance in Ms. Tillman's checking account is typically under $100.00.

5. Plaintiff Shirley Richardson obtained a loan from Commercial Credit on 4 June 1999. The amount financed in that loan was

$20,935.57, with $4,208.75 attributable to single-premium credit insurance. The interest rate was over 15%. In connection with that loan, Ms. Richardson was charged $1,871.54 for single-premium credit life insurance, $1,109.49 for single-premium credit disability insurance, and $1,227.72 for single-premium credit involuntary unemployment insurance. Ms. Richardson had received two prior loans from Commercial Credit, and both of those loans included single-premium credit insurance. Those prior Commercial Credit loans were originated in October 1997 and April 1998; Ms. Richardson was charged $3,782.96 for credit insurance premiums in connection with those loans. With her June 4, 1999 loan, Ms. Richardson was also charged $499.95 for a "Home Security Plan." She was not told what that product or service is at the time of closing or at any point thereafter.

6. Plaintiff Shirley Richardson has few economic resources. Ms. Richardson works full-time in the medical records section at Murdock Center in Henderson, North Carolina, where she earns $12.70 per hour. She also works part-time at the Louisburg Group Home as a direct care aide, earning $12.00 per hour during the 10-15 hours per week she works that job. Ms. Richardson, who is 52 years of age, had $2,523.25 in her retirement account as of the date of the hearing of this matter. Ms. Richardson lives from paycheck to paycheck, and after paying her monthly bills often has no money in her bank account. Ms. Richardson's most significant asset is her home in Henderson, North Carolina, which is encumbered by a first and second mortgage. Ms. Richardson has substantial outstanding credit card debt.

7. CitiFinancial Services, Inc. is a subprime lender which typically loans money to borrowers, such as Plaintiffs Tillman and Richardson, with impaired credit who oftentimes would not qualify for financing at lending institutions primarily making loans in the prime, or conventional, lending market.

8. Since February 12, 1996, CitiFinancial Services, Inc. has included an arbitration clause in its loan agreements. Prior to that time, Defendant's loan agreements did not contain an arbitration clause. . . .

9. The Commercial Credit arbitration clause is a standard-form contract of adhesion. The borrower is given no opportunity to negotiate out of the arbitration provision, and CitiFinancial Services, Inc. would not make a loan if the loan agreement did not include the

arbitration provision. The loan documents, including the arbitration provision at issue, were drafted by Defendant.

10. Since the time CitiFinancial Services, Inc. began including an arbitration clause in its loan agreements, the lender has made more than 68,000 loans in North Carolina. During that time, CitiFinancial Services, Inc. has pursued lawsuits in civil court against more than 3,700 borrowers in North Carolina, including over 2,000 collection actions and more than 1,700 foreclosure actions. Defendant has been able to pursue claims in civil court by virtue of two exceptions within the arbitration clause, which Defendant drafted, for (1) foreclosure actions and (2) matters in which less than $15,000.00 in damages, including costs and fees, are sought. The average amount in dispute in matters in which CitiFinancial Services, Inc. pursued legal action against North Carolina borrowers is under $7,000.00.

11. Since the time CitiFinancial Services, Inc. began including an arbitration provision in its loan agreements, there have been no arbitration proceedings in North Carolina involving CitiFinancial Services, Inc. and any of its borrowers. Since introduction of the arbitration clause, no North Carolina borrower has requested arbitration of any dispute with CitiFinancial Services, Inc., nor has CitiFinancial Services, Inc. demanded arbitration of any dispute involving any North Carolina borrower. The only legal redress sought has been the collection and foreclosure actions pursued in civil court by Defendant against its borrowers.

12. The only persons present at the loan closings involving Plaintiffs Tillman and Richardson were Plaintiffs and a Commercial Credit loan officer. Ms. Tillman and Ms. Richardson were rushed through the loan closings, and the Commercial Credit loan officer indicated where Ms. Tillman and Ms. Richardson were to sign or initial the loan documents. There was no mention of credit insurance or the arbitration clause at the loan closings.

. . .

14. Plaintiffs Fannie Lee Tillman and Shirley Richardson entered into contingency fee contracts with the attorneys representing them. The contingency fee contract is typical of such agreements. The contingency fee agreement entered into by Plaintiffs provides that their attorneys will not be entitled to any fee unless there is some monetary recovery obtained on behalf of Plaintiffs, either by way of settlement or verdict. The agreement further pro-

vides that the law firm representing Plaintiffs shall advance the costs and expenses incurred in prosecuting the action.

15. Based upon the 1998 North Carolina Bar Association Economic Survey, the most recent survey published, the average hourly rate for attorneys working on litigation matters such as this is between $150.00-$250.00 per hour.

16. . . . . The only realistic means by which persons in the position of Plaintiffs can prosecute their claims is by entering into a contingency fee agreement with lawyers willing to advance the costs and expenses of the litigation and with the law firm assuming the risk that there might be no recovery.

. . .

19. To successfully prosecute a complex case, including a class action such as this one, a law firm would likely need the assistance of expert witnesses. The hourly fees of experts in the fields of economics, lending practices, and credit insurance can range from $150.00 to $300.00 per hour, plus expenses. In complex cases, litigation costs and expenses, including deposition costs, travel expenses, and expert witness fees, can easily run into thousands of dollars. The class action mechanism allows persons with relatively small claims to pool their resources and have those litigation expenses and costs shared among all class members. The class action device provides a means by which consumers with modest damages claims can obtain representation by competent counsel with sufficient resources to afford protracted litigation in complex cases.

The trial court also made the following findings, portions of which are disputed by defendants:

13. The compensation rates for American Arbitration Association ("AAA") arbitrators in North Carolina range from $500.00 to $2,380.00 per day. The average daily rate of AAA arbitrator compensation in North Carolina is $1,225.00.

. . .

17. Plaintiffs asserted claims for relief under Chapter 75 of the North Carolina General Statutes, contending that Defendants' sale of single-premium credit insurance in connection with real estate loans constituted an unfair or deceptive trade practice or act in or affecting commerce. Plaintiffs seek damages based upon the

amount of premiums charged for those credit insurance products. In most cases, the premium charges for single-premium credit insurance sold by CitiFinancial Services, Inc. were under $5,000.00 per loan. Plaintiff Fannie Lee Tillman was charged $2,064.75 in single-premium credit insurance premiums in connection with her September 22, 1998 loan; Plaintiff Shirley Richardson was charged $4,208.75 for single-premium credit insurance with her June 4, 1999 loan. The relatively modest damages claimed by Plaintiffs make it unlikely that any attorneys would be willing to accept the risks attendant to pursuing claims against one of the nation's largest lenders, even with the prospect of a treble damages award and statutory attorney's fees. It would not be feasible to prosecute the claims of the named Plaintiffs and of putative class members on an individual basis.

18. Defendant's arbitration clause contains features which would deter many consumers from seeking to vindicate their rights. These features include the cost-shifting ("loser pays") provision with respect to the initial arbitration proceeding to the extent it exceeds eight hours, the cost-shifting provision associated with the de novo appeal from that initial arbitration proceeding, and the prohibition on joinder of claims and class actions. The prohibition on class actions and the cap of $15,000.00 on the value of claims that can be pursued outside of the arbitration process designed by Defendant makes it unlikely that borrowers would be able to retain lawyers willing to pursue litigation against a large commercial entity, such as CitiFinancial Services, Inc.

Based on these findings, the trial court determined the arbitration clause to be unconscionable and denied defendants' motion to compel arbitration. Defendants appeal.

"Although arbitration is favored in the law, in order to be enforced, the underlying agreement must first be shown to be valid as determined by a common law contract analysis." *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 118, 516 S.E.2d 879, 881 (1999); *see also Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268, 271, 423 S.E.2d 791, 794 (1992) (stating that "before a dispute can be settled in this manner, there must first exist a valid agreement to arbitrate"). The party seeking arbitration has the burden of showing the parties mutually agreed to arbitrate their disputes. *Routh*, 108 N.C. App. at 271-72, 423 S.E.2d at 794; *King v. Owen*, 166 N.C. App. 246, 248, 601 S.E.2d 326, 328 (2004). Arbitration clauses included in contracts of adhesion are disfavored in law. *Routh*,

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

108 N.C. App. at 272, 423 S.E.2d at 794; *Blow v. Shaughnessy*, 68 N.C. App. 1, 16, 313 S.E.2d 868, 876-77 (1984).

Where a contract is unconscionable, it is not valid and the court should not enforce it. *Brenner v. School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981). "In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." *Id.* (holding that, as there was no inequality of bargaining power between the parties, the contract was not unconscionable).

In the present case, the trial court concluded the arbitration clause was unconscionable on the grounds that (1) it exposed borrowers to prohibitively high arbitration costs; (2) was excessively one-sided and lacked mutuality; and (3) prohibited class actions. Although any one of these factors, standing alone, might withstand judicial scrutiny, the trial court concluded that "[t]he combination of these factors, taken on the whole, render the Commercial Credit arbitration clause unconscionable." In separately rejecting each ground as a basis for the trial court's decision, the majority fails to recognize or address the combined impact of these three factors on the fundamental fairness of the contracts at issue.

With regard to the costs of arbitration, the majority rejects the trial court's conclusion that the costs of arbitration would be "prohibitive" as unsupported by the evidence. The majority overlooks numerous key and uncontradicted findings by the trial court, however, and misapplies the law to the case at hand.

For example, the majority complains that "[p]laintiffs . . . failed to address or quantify the costs of litigation associated with this lawsuit if they *were not* successful in the superior court or the costs of an appeal." However, as recognized by the majority and expressly found by the trial court, plaintiffs entered into a contingency fee contract with their attorneys. The contingency fee contract provides that "no attorney's fee will be charged Client at any time unless and until a recovery is obtained from Creditor." The agreement further provides that the law firm representing plaintiffs shall advance the costs and expenses incurred in prosecuting the action. Thus, under the contingency fee contract, if litigation was not successful and plaintiffs recovered nothing, they would owe no attorneys' fees. Under such a scheme, plaintiffs' attorneys bear the risk of any unsuccessful litigation.

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

The majority cites *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556 n.5 (4th Cir. 2001), as authority for the proposition that "an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs *and his ability to pay those costs*, measured against a baseline of the claimant's expected costs for litigation *and his ability to pay those costs*." *Id.* (emphasis added). The majority fails to recite the extensive findings made by the trial court which were unchallenged by defendants, detailing plaintiffs' extremely limited financial resources and their inability to pay the costs associated with arbitration. Indeed, the trial court found that

> [t]he only realistic means by which persons in the position of [p]laintiffs can prosecute their claims is by entering into a contingency fee agreement with lawyers willing to advance the costs and expenses of the litigation and with the law firm assuming the risk that there might be no recovery.

In addition, the majority's selective reference to *Bradford* omits language immediately following the statement quoted above: "Another factor to consider in the cost-differential analysis is whether the arbitration agreement provides for fee-shifting, including the ability to shift forum fees based upon the inability to pay." *Id.*

The arbitration agreement here provides for no fee-shifting based on plaintiffs' inability to pay—just the opposite. It includes a cost-shifting "loser pays" provision that exposes plaintiffs to potentially substantial arbitration costs. "[I]t is undisputed that fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum." *Id.* at 554 (citing *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 148 L. Ed. 2d 373 (2000)), ("[i]t may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum").

The Court in *Bradford* ultimately rejected the plaintiff's claim because he offered "no evidence that he was unable to pay the $4,470.88 that he was billed by the [arbitration], or that the fee-splitting provision deterred him from pursuing his statutory claim or would have deterred others similarly situated." *Id.* at 558 (footnote omitted). Unlike *Bradford*, plaintiffs here presented substantial evidence, and the trial court found, that they were unable to pay the arbitration fees and costs, and that the arbitration clause contained features, such as the cost-shifting provision, that would deter many similarly-situated con-

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[177 N.C. App. 568 (2006)]

sumers from seeking to vindicate their rights. Such deterrence is evident from the uncontradicted fact that:

> Since the time CitiFinancial Services, Inc. began including an arbitration provision in its loan agreements, there have been no arbitration proceedings in North Carolina involving CitiFinancial Services, Inc. and any of its borrowers. Since introduction of the arbitration clause, no North Carolina borrower has requested arbitration of any dispute with CitiFinancial Services, Inc., nor has CitiFinancial Services, Inc. demanded arbitration of any dispute involving any North Carolina borrower. The only legal redress sought has been the collection and foreclosure actions pursued in civil court by Defendant against its borrowers.

The trial court also found that the "average daily rate of AAA arbitrator compensation in North Carolina is $1,225.00." The trial court concluded that:

> The Commercial Credit arbitration clause, as written, exposes borrowers to prohibitively high arbitration costs. The arbitration clause exposes consumers to arbitrator fees, based upon the AAA average for North Carolina, of $1,225.00 per day after the first eight hours of hearings. For example, a three-day arbitration with an arbitrator charging the average AAA hourly fee in North Carolina could cost a borrower $2,450.00, plus costs and attorneys' fees. If the arbitrator charged the high end of the range in North Carolina, a borrower could face arbitration fees of $4,760.00 for a three-day arbitration, plus costs and attorneys' fees.

Plaintiffs also presented substantial evidence of the expected costs of litigation and their ability to pay such costs. The trial court made detailed findings therefrom which supported its conclusions of law. I therefore disagree with the majority's conclusion that the trial court erred in finding the costs of arbitration to be prohibitive for these plaintiffs.

The majority also finds fault with the trial court's conclusion regarding lack of mutuality and the one-sided nature of the arbitration clause. After the majority cites and relies upon cases from the United States Courts of Appeal of the Third, Fourth, Seventh, and Eleventh Circuits, and the appellate courts of Illinois, Alabama, Colorado, Delaware, and Texas, the majority chides the trial court for failing to cite to North Carolina precedent. The majority then applies an appellate decision from Maryland to the issue.

The majority unfairly characterizes the trial court's conclusions regarding the one-sidedness of the arbitration clause as "applying a requirement of mutuality to the arbitration agreement that is contrary to North Carolina law." The trial court, however, never concluded that the contract terms contained in the arbitration agreement had to apply equally to both parties to be enforceable. Rather, the trial court properly concluded that the one-sidedness and lack of mutuality of the arbitration clause was one factor in determining that the contract was unconscionable. As noted *supra*, where provisions in a contract are "so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." *Brenner*, 302 N.C. at 213, 274 S.E.2d at 210.

Here, the trial court found that "CitiFinancial Services, Inc. is a subprime lender which typically loans money to borrowers, such as Plaintiffs Tillman and Richardson, with impaired credit who oftentimes would not qualify for financing at lending institutions primarily making loans in the prime, or conventional, lending market." The trial court made further findings detailing the inequality of the bargaining power between the parties as follows:

9. The Commercial Credit arbitration clause is a standard-form contract of adhesion. The borrower is given no opportunity to negotiate out of the arbitration provision, and CitiFinancial Services, Inc. would not make a loan if the loan agreement did not include the arbitration provision. The loan documents, including the arbitration provision at issue, were drafted by Defendant.

10. Since the time CitiFinancial Services, Inc. began including an arbitration clause in its loan agreements, the lender has made more than 68,000 loans in North Carolina. During that time, CitiFinancial Services has pursued lawsuits in civil court against more than 3,700 borrowers in North Carolina, including over 2,000 collection actions and more than 1,700 foreclosure actions. Defendant has been able to pursue claims in civil court by virtue of two exceptions within the arbitration clause, which Defendant drafted, for (1) foreclosure actions and (2) matters in which less than $15,000.00 in damages, including costs and fees, are sought. The average amount in dispute in matters in which CitiFinancial Services, Inc. pursued legal action against North Carolina borrowers is under $7,000.00.

11. Since the time CitiFinancial Services, Inc. began including an arbitration provision in its loan agreements, there have been no

arbitration proceedings in North Carolina involving CitiFinancial Services, Inc. and any of its borrowers. Since introduction of the arbitration clause, no North Carolina borrower has requested arbitration of any dispute with CitiFinancial Services, Inc., nor has CitiFinancial Services, Inc. demanded arbitration of any dispute involving any North Carolina borrower. The only legal redress sought has been the collection and foreclosure actions pursued in civil court by Defendant against its borrowers.

Based in part on these uncontradicted findings, the trial court concluded that the arbitration clause was

> one-sided and lacks mutuality, in that it preserves for the lender the right to pursue almost all claims it would choose to pursue in civil court while denying that right to borrowers in most instances. The arbitration clause contains exceptions for foreclosure actions and claims in which the amount sought, including costs and attorneys' fees, is under $15,000.00. This portion of the clause preserves for the lender the only remedies it would be likely to assert against borrowers—foreclosure and collection actions. A foreclosure action, coupled with or preceding a collection action for any shortfall, is all Defendant would need to enforce its rights under the real estate secured loans against its customers. Defendant has pursued such actions more than 3,700 times against North Carolina borrowers since the arbitration clause has been included in Defendant's loan agreements.

This conclusion is fully supported by the trial court's unchallenged findings of fact and should be upheld.

The majority nevertheless asserts that the arbitration clause is perfectly mutual because the exclusions "apply equally" to plaintiffs and defendants. This assertion completely fails to acknowledge that only defendants would have any interest in pursuing most actions under the exclusions. Quite obviously, plaintiffs would never be in a position to bring an "action to effect a foreclosure." The fact that plaintiffs could not be forced to arbitrate such an action is therefore of no benefit whatsoever to plaintiffs and entirely to the benefit of defendants. Likewise, the exclusion of actions worth less than $15,000.00 is of most benefit to defendants, who have regularly used the exclusion in their collection actions. Plaintiffs meanwhile are faced with the difficulty of finding an attorney willing to pursue a claim where relatively modest damages are at stake. The "mutuality" found by the majority is therefore illusory.

Finally, the majority takes issue with the trial court's conclusion that "[a] prohibition on the right to join claims and participate in class action lawsuits is a factor to be considered in determining whether an arbitration provision is unconscionable." The majority asserts that, in accepting plaintiffs' position that the preclusion of class actions deters them from bringing claims against defendants due to the modest damages at stake, the trial court "ignore[d] the fact that the consumer protection statute underlying plaintiffs' claims provides for the recovery of plaintiffs' costs and attorney's fees[.]" The trial court, however, specifically found that "[t]he relatively modest damages claimed by Plaintiffs make it unlikely that any attorneys would be willing to accept the risks attendant to pursuing claims against one of the nation's largest lenders, *even with the prospect of a treble damages award and statutory attorney's fees.*" (Emphasis added.) Thus the trial court specifically considered the possibility of the statutory recovery of costs and attorneys' fees and nevertheless found that the preclusion of class action would make it difficult for plaintiffs to enforce their rights.

The majority cites numerous cases from other jurisdictions in which the courts have upheld arbitration clauses which contained class action waivers. The majority acknowledges that these cases are not binding on this Court. Moreover, in many of the cases cited by the majority, the claimants' arguments were rejected because they failed to offer any evidence regarding the financial burden arbitration would pose. *See, e.g., Livingston v. Associates Finance, Inc.*, 339 F.3d 553, 557 (7th Cir. 2003) (holding that, because the plaintiffs failed to offer "any specific evidence of arbitration costs that they may face in this litigation, prohibitive or otherwise, and . . . failed to provide any evidence of their inability to pay such costs," they could not avoid arbitration); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002) (concluding that the plaintiff's failure to offer any evidence regarding the costs of arbitration "renders his further complaint about the inability to bring a class action moot"); *Bradford*, 238 F.3d at 554; *Rains v. Foundation Health Systems*, 23 P.3d 1249, 1253 (Colo. Ct. App. 2001) (same); *see also Jenkins v. First American Cash Advance of Georgia*, 400 F.3d 868, 878 n.8 (11th Cir. 2005) (noting that the plaintiff's arbitration costs would not be burdensome); *Autonation USA Corp. v. Leroy*, 105 S.W.3d 190, 200 (Tex. Ct. App. 2003) (footnote omitted) (acknowledging that "[w]hile there may be circumstances in which a prohibition on class treatment may rise to the level of fundamental unfairness, [plaintiff]'s generalizations do not satisfy her burden to demonstrate that the arbitration provision is invalid here"). In contrast to these cases, the present

plaintiffs offered substantial evidence of their limited financial resources and the prohibitive costs of arbitration.

Other cases cited by the majority never address the issue of unconscionability. *See, e.g., Livingston*, 339 F.3d 553; *Johnson v. West Suburban Bank*, 225 F.3d 366 (3d Cir. 2000). The majority does not acknowledge the many decisions with remarkably similar facts holding that the presence of a class action waiver may render an arbitration agreement unenforceable. *See, e.g., Kristian v. Comcast Corp.*, 2006 U.S. App. LEXIS 9881 (1st Cir. Apr. 20, 2006) ("a class mechanism bar can impermissibly frustrate the prosecution of claims in any forum, arbitral or judicial"); *Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir. 2003) (footnote omitted) ("we affirm the district court's conclusion that the class-action ban violates California's unconscionability law"); *Luna v. Household Finance Corp. III*, 236 F. Supp. 2d 1166, 1179 (W.D. Wash. 2002) (prohibition on class actions rendered arbitration clause unconscionable); *Lozada v. Dale Baker Oldsmobile, Inc.*, 91 F. Supp. 2d 1087, 1105 (W.D. Mich. 2000) (same); *Leonard v. Terminix Intern. Co., L.P.*, 854 So. 2d 529, 539 (Ala. 2002) ("[t]his arbitration agreement is unconscionable because it is a contract of adhesion that restricts the [plaintiffs] to a forum where the expense of pursuing their claim far exceeds the amount in controversy. The arbitration agreement achieves this result by foreclosing the [plaintiffs] from an attempt to seek practical redress through a class action and restricting them to a disproportionately expensive individual arbitration"); *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 576 (Fla. Dist. Ct. App. 1999); *State ex rel. Dunlap v. Berger*, 211 W. Va. 549, 567 S.E.2d 265 (W. Va. 2002). The majority's statement that "[t]he great majority of federal and state jurisdictions who have addressed this issue are directly contrary to the trial court's findings and conclusions" is therefore unsupported. I would affirm the trial court's conclusion that the arbitration clause's prohibition on class actions is one factor supporting the ultimate determination of unconscionability.

Where there is "an absence of meaningful choice on part of one of the parties together with contract terms which are unreasonably favorable to the other" a contract may be found unconscionable. *Martin v. Sheffer*, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991). The trial court here found both procedural and substantive unconscionability. The trial court found as undisputed fact that plaintiffs "were rushed through the loan closings[.]" The loan officer did not mention or explain the arbitration clause, but simply indicated where plaintiffs were to sign or initial the loan documents. The arbitration clause at issue here was a standard form contract of adhesion disfavored in law, the

NELSON v. HARTFORD UNDERWRITERS INS. CO.

[177 N.C. App. 595 (2006)]

practical effects of which prevented plaintiffs from effectively vindicating their rights.

In their suit against defendants, plaintiffs are seeking relief from an insurance product so abusive that the General Assembly has now outlawed its sale under North Carolina's Predatory Lending Law. *See* N.C. Gen. Stat. § 24-1.1E (2005) (effective 1 July 2000). The record in this case demonstrates that the trial court considered all the relevant facts and circumstances in assessing the enforceability of the arbitration clause at issue. *Brenner*, 302 N.C. at 213, 274 S.E.2d at 210. The trial court made findings of fact detailing plaintiffs' limited financial resources, the costs that would be incurred by plaintiffs through arbitration, the effect of the arbitration provision upon plaintiffs' ability to seek redress for grievances, and the importance of class action lawsuits in cases involving relatively modest damages. Plaintiffs presented substantial evidence to support the trial court's findings. Based on the evidence and the findings, the trial court concluded that "[t]he combination of these factors, taken on the whole, render the Commercial Credit arbitration clause unconscionable. Because the arbitration provision is unconscionable, it is unenforceable." The trial court therefore denied defendants' motion to compel arbitration. The trial court's decision is supported by the law of North Carolina. *See id.* ("[i]f the provisions [of a contract] are . . . so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable"). As the trial court's decision is supported by the evidence and the law, I would affirm the decision of the trial court.